51 A.3d 51

Maria IGLESIAS

v.

PENTAGON TITLE AND ESCROW, LLC, et al.

Nos. 1562, 1563, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Aug. 30, 2012.

**626**

D. Scott Messersmith (Montero Law Group, LLC, on the brief), Silver Spring, MD, for Appellant.

Robert M. Gittins, Rockville, MD, and Chad King, Annapolis, MD (William J. Hickey, Law of William J. Hickey, Rockville, MD, John S. Simcox, Simcox and Barclay, LLP, Annapolis, MD), on the briefs, for Appellee.

Panel: DEBORAH S. EYLER, GRAEFF, JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

We have before us two related appeals arising from an incident of identity fraud. In July of 2006, Maria Iglesias, the appellant, a first-time home buyer, engaged the services of a loan officer, Jose Ramirez, in an effort to purchase a condominium. The deal ultimately fell through. Shortly thereafter, Iglesias began working with another loan officer to obtain financing to purchase a different condominium. She did not qualify for financing, however, because a credit search revealed she recently had purchased a house in Montgomery County encumbered by two mortgage loans in her name. This came as a complete shock to her, as she had no knowledge of such a purchase.

A criminal investigation ensued. It revealed that Ramirez and others associated with him had perpetrated a fraud by which two properties were purchased in Iglesias's name. In each transaction, without Iglesias's knowledge, a sales contract was signed; financing was obtained; and a real estate settlement was consummated under the strength of a forged power of attorney ("POA").

In July of 2009, in the Circuit Court for Montgomery County, Iglesias filed two separate actions for negligence and for declaratory judgment against various parties involved in each real estate transaction ("First Action" and "Second Action" respectively). All of the issues in these appeals arise out of Iglesias's second amended complaint ("SAC") in each action. In the SAC in her First Action, Iglesias set forth one count of negligence against Pentagon Title & Escrow, LLC ("Pentagon"), the company that conducted the real estate settlements; one count of negligence against Christina Shin, an attorney and Pentagon member who acted as the settlement agent in both transactions; and one count of negligence against JP Morgan Chase Bank, N.A. ("Chase"), the lender. Iglesias's SAC in the Second Action was identical, except that the lender was WMC Mortgage Company ("WMC"). Iglesias subsequently dismissed her claim against WMC.[1] Pentagon and Shin are appellees in both appeals. Chase is an appellee in only one appeal.

By order dated February 1, 2010, the First Action, the Second Action, and a third case against Pentagon involving a different plaintiff and lender were consolidated. Pursuant to the consolidation order, filings still were to be made in each

---

1. In the Second Action, Iglesias initially also named as defendants Mary Ellen Baker, Bryce Baker, and Bank of America. She alleged that WMC had instituted foreclosure proceedings against the subject property and that the Bakers had purchased the property at the resulting public auction. Bank of America was the current lienholder. Iglesias subsequently dismissed with prejudice her claims against these parties as well.

In both actions, Pentagon, Chase, and WMC asserted cross-claims and third-party complaints against various other parties. None of these claims are relevant to the issues on appeal.

individual case. The third case subsequently was severed from Iglesias's cases and is not before us in the instant appeals.

In the First Action, Chase moved to dismiss the SAC for failure to state a claim for which relief could be granted, arguing that it did not owe a duty of care to Iglesias and that she had failed to allege facts that could support findings of proximate causation and damages. After a hearing, Chase's motion was granted with prejudice.

In the First and Second Actions, Iglesias moved for entry of an order of default against Shin, which Shin opposed. Iglesias also moved for partial summary judgment against Pentagon and Shin on the issue of liability. Pentagon and Shin moved to dismiss the SAC for failure to state a claim for which relief could be granted or, alternatively, for summary judgment. Like Chase, they argued that they did not owe a duty of care to Iglesias. Shin also maintained that the action against her was time-barred.

After hearing argument of counsel, the circuit court granted summary judgment in favor of Shin on limitations and further granted summary judgment in favor of Pentagon and Shin on the issue of duty. The court denied Iglesias's motions for partial summary judgment and her motion for default.

Iglesias appeals the judgments in favor of Pentagon, Chase, and Shin, posing four questions for review, which we have combined and restated as follows:

I.    Did the circuit court err in ruling in the First Action that, under the well-pleaded facts alleged in her SAC, Chase did not owe Iglesias a legal duty to verify that she was a party to the transaction?

II.   Did the circuit court err in granting summary judgment in the First and Second Actions in favor of Pentagon and Shin based on the ground that they did not owe Iglesias a legal duty to look behind a facially valid POA?

III. In the First and Second Actions, did the circuit court abuse its discretion by denying Iglesias's motion for order of default against Shin and by ruling that Iglesias's action against Shin was barred by limitations?

For the reasons to follow, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS[2]

In July of 2006, Iglesias was renting an apartment in Washington, D.C., and was in the market to purchase her first home. She responded to an advertisement for a condominium for sale in Hyattsville. The owner, identified to Iglesias as "Oscar," referred her inquiry to his agent, Albert Gomez. Gomez in turn referred Iglesias to Ramirez, who, as already discussed, purported to be a loan officer.

Upon Ramirez's request, Iglesias provided him with a number of personal financial records. Supposedly, with that information in hand, he pursued financing on her behalf. Iglesias subsequently made an offer to purchase Oscar's condominium, which he accepted. Settlement was scheduled for September 12, 2006. At some point, however, Ramirez advised Iglesias that there was a problem with the financing and settlement was postponed to a later date. In the interim between September 12, 2006, and the postponed settlement date, Oscar told Iglesias that he "no longer wished to sell" the condominium she had contracted to purchase, but that he had another condominium for sale if she was interested. At that point, Iglesias became "uneasy about the transaction" and ended negotiations.

Sometime later that month, Iglesias used the services of a new loan officer to assist in obtaining financing with which to purchase a different condominium. It was then that she discovered that she was a record owner of a house located at

---

2. We present the facts as gleaned from pleadings and the record on summary judgment with some supplementation from other documents appearing in the record.

13114 English Turn Drive in Silver Spring ("English Turn Property"). Later, Iglesias learned that she also was a record owner of a house located at 19067 Sawyer Terrace in Germantown ("Sawyer Terrace Property"). Both properties were encumbered by deeds of trust ("DOT") supported by loans solely in Iglesias's name.

Six months later, in March of 2007, Iglesias reported to the police that she believed she had been the victim of identity theft. In the course of the ensuing police investigation, the settlement files from each transaction were seized from Pentagon's offices in Rockville. These documents revealed that the central players in both transactions were the same. Gomez, a real estate agent with Remax Home Centre, acted as the buyer's agent and prepared the residential contract of sale; Kenneth C. Sanchez, of First Advantage Mortgage Company ("First Advantage"), acted as the loan officer [3]; and settlement occurred at Pentagon's office. In addition, at each settlement, the subject property was conveyed to Iglesias and another individual as joint tenants, but only Iglesias was obligated on the loans associated with the DOTs. Thus, Iglesias shared ownership of both properties but did not share liability for the loans for the properties. Finally, in each case, settlement proceeded on the strength of a POA notarized by Myriam Rodriguez purporting to authorize an individual to act on Iglesias's behalf to consummate the real estate transaction.[4]

The sales contract for the English Turn Property was executed on July 27, 2006. It reflected that one Raymond Ekpedeme was the seller and that Iglesias was the buyer. The contract price was $897,500 and settlement was scheduled for August 4, 2006.

---

**3.** Sanchez no longer was employed at First Advantage as of March of 2007. He acknowledged to police that he never met with Iglesias and that all of the information provided to the lenders on the loan application was given to him by Ramirez. He stated that he was not required to verify a potential borrower's income in order to process a loan.

**4.** During the police investigation, Rodriguez admitted that she sometimes notarized documents "as a favor" to her friends without the signatory being present.

On July 31, 2006, Jennifer Lee, a Pentagon employee, received an email from Sanchez, who, as mentioned above, was the loan officer. He stated that "[t]here is a new buyer on this property because the last buyer fell through at the last minute." He asked Lee to "change the buyer and the loan amounts on the title as well as the mortgagee info." He identified Iglesias as the new buyer and said she would be financing the $897,500 purchase price with two mortgage loans, one for $650,000 and one for $247,500. His email ended by stating, "there is still going to be a power of attorney Jose Ramirez and he will be going on title. . . . I also am looking to close this deal on [W]ednesday late afternoon."

Three days later, on August 3, 2006, settlement went forward in Pentagon's office with Shin acting as the settlement agent. Ekpedeme and Ramirez were present. Iglesias was not. Ramirez gave Shin a "Special Power of Attorney" ("Ramirez POA"). It stated in pertinent part:

KNOW ALL MEN BY THESE PRESENTS, that I, **MARIA IGLESIAS,** of Montgomery County, Maryland do hereby appoint **JOSE R. RAMIREZ,** as my true and lawful attorney-in-fact for me and in my name, place, and stead to secure, acknowledge, sign, seal, and deliver, and cause to be recorded any and all contracts, checks, deeds, deeds of trust, notes, mortgages, and other writing which may be necessary or desirable for me to execute for the **PURCHASE** of the following described property, located in PRINCE GEORGE'S County,[5] Maryland and more particularly described as:

Address: 13114 English Turn Drive, Silver Spring, MD 20904

(Emphasis in original.) The Ramirez POA further provided that it would terminate automatically on August 31, 2006. It was dated by hand August 3, 2006 (the same day as settle-

---

**5.** The property actually is located in Montgomery County. We shall discuss this discrepancy further, *infra.*

ment) and was signed "Maria Iglesias." Finally, it was notarized by Rodriguez.

At settlement, Shin asked to see Ramirez's photographic identification. After his identity was so confirmed, Ramirez, acting under the force of the POA, executed loan documents; signed a Truth in Lending Act disclosure; initialed and acknowledged receipt of the HUD–1 settlement sheet; signed an affidavit attesting that he and Iglesias were first-time home-buyers; and signed an "Affidavit of Purchaser Regarding Exemption From Recordation Tax" attesting that he and Iglesias intended to use the English Turn property as their primary residence. Ekpedeme executed a Deed conveying the property in fee simple to Iglesias and Ramirez as joint tenants.

The HUD–1 settlement sheet for the English Turn Property shows an $897,500 purchase price fully financed with Iglesias alone being obligated on a first loan of $650,000 and a second loan of $247,285.[6] Chase was the lender on both.[7] The proceeds of the loans were used to pay off an existing first mortgage of $655,910.09 and an existing second mortgage of $174,760.21. After closing costs, Ekpedeme netted $6,885.90. Iglesias owed $3,000 at closing. It appears that that amount was paid by a check signed by one Luis Canales.

A Uniform Residential Loan Application prepared by Sanchez and executed by Ramirez on behalf of Iglesias stated that she had been approved for a conventional, adjustable rate mortgage ("ARM") of $650,000, with a starting interest rate of seven percent.[8] The loan application further represented that the English Turn Property would be Iglesias's primary resi-

---

6. The total amount of the two loans is $215 less than the purchase price. It is unclear whether this is a typographical error.

7. As we shall discuss, it is apparent that Chase's closing instructions to Pentagon called for Iglesias to be the sole obligor on the loans but to share title to the English Turn Property with Ramirez.

8. There are no documents in the record pertaining to Iglesias's second mortgage.

dence and that she would own the property jointly with Ramirez. It stated that Iglesias had been employed for more than five years by East West Financial, LLC, as a senior consultant, with a gross monthly income of $17,800. A "Request for Verification of Employment" form, purportedly signed by Iglesias's employer, Kenneth C. Sanchez,[9] the President of East West Financial, LLC, was attached.

On August 14, 2006, the Deed and associated DOTs for the English Turn Property were recorded in the Land Records of Montgomery County ("Land Records").

Twenty-eight days later, on August 31, 2006, settlement on the Sawyer Terrace Property took place, also at Pentagon's office. The sales contract reflected that it was executed between Hugo and Marina Fochi, the sellers, and Iglesias, the buyer, on August 10, 2006.

At settlement, the listing agent, Andres Franzetti, appeared and acted as attorney-in-fact for the Fochis. Luis Canales, the same person who had paid the $3,000 Iglesias owed at the closing on the English Turn Property, appeared on behalf of himself and Iglesias and gave Pentagon a "Special Power of Attorney" ("Canales POA"). It stated in pertinent part:

> KNOW ALL MEN BY THESE PRESENTS, that I, **MARIA IGLESIAS,** of Montgomery County, Maryland do hereby appoint **LUIS CANALES,** as my true and lawful attorney-in-fact for me and in my name, place and stead to secure, acknowledge, sign, seal, and deliver, and cause to be recorded any and all contracts, checks, deeds, deeds of trust, notes, mortgages, and other writing which may be necessary or desirable for me to execute for the PURCHASE of the following described property, located in MONTGOMERY County, Maryland and more particularly described as:
>
> Address: 19067 Sawyer Terrace, Germantown, MD 20874

---

**9.** The record does not reveal whether this was the same individual as the loan officer of the same name.

(Emphasis in original.) The POA further provided that it would terminate automatically on September 25, 2006. It was dated by hand August 29, 2006 (two days before settlement) and was signed "Maria Iglesias." Finally, it was notarized by Rodriguez.

Shin asked to see Canales's photographic ID, which he produced. Thereafter, Canales, acting under the force of the POA, executed loan documents; signed a Truth in Lending Act disclosure; initialed and acknowledged receipt of the HUD–1 settlement sheet; and signed an "Occupancy Statement" attesting that he and Iglesias would occupy the subject property as their principal residence. Franzetti, as attorney-in-fact for the Fochis, executed a Deed conveying the Sawyer Terrace Property in fee simple to Iglesias and Canales as joint tenants.

The HUD–1 settlement sheet showed a purchase price of $440,000 that was fully financed. Iglesias alone was obligated on a first loan of $352,000 and a second loan of $87,038.05.[10] WMC was the lender on both.[11] The proceeds of the loans were used to pay off an existing mortgage of $304,332.08. After closing costs, the Fochis netted $94,204.49. Iglesias owed $4,149.81 at closing. This sum was paid by two checks signed by Canales.

A Uniform Residential Loan Application prepared by Sanchez and executed by Canales on behalf of Iglesias stated that Iglesias had been approved for a conventional, fixed rate mortgage of $352,000, with an interest rate of seven and a quarter percent.[12] The loan application further represented that the Sawyer Terrace Property would be Iglesias's primary

---

10. The total amount of the two loans is $215 less than the purchase price. It is also unclear whether this was a typographical error.

11. As we shall discuss, just as in the first transaction, it is apparent that WMC's lending instructions called for Iglesias to be the sole obligor but a joint title holder.

12. There are no documents in the record pertaining to Iglesias's second mortgage.

residence and that she would own the property jointly with Canales. It further stated that Iglesias had been employed for more than three years by Efrain Drywall as a "Sub Contractor Finisher," with a gross monthly income of $9,500.

On September 29, 2006, the Deed and associated DOTs for the Sawyer Terrace Property were recorded in the Land Records.

As discussed above, in July of 2009, Iglesias filed suit in the First Action and the Second Action. In her SAC in each action, she alleged that the real estate transactions were consummated without her knowledge or consent; that she did not sign the POAs; and that, until September of 2006, she was unaware that the transactions even had occurred. In Count I of the SAC in each action, Iglesias alleged that Pentagon owed her a "duty of reasonable diligence and professional competence" in conducting the settlement. She alleged that Pentagon had breached its duty of care to her by failing to conduct "even a marginally diligent investigation" to determine if she were a true party to the transaction. She further alleged that the breach proximately caused damages in that it "adversely affected [her] credit."

In Count III of the SAC in each action, Iglesias made the same allegations of negligence against Shin. She further alleged that, pursuant to Md.Code (2007 Repl.Vol., 2011 Supp.), section 4A–301.1 of the Corporations and Associations Article ("CA"), Shin was personally liable for her negligent acts.[13]

Finally, in Count II of the SAC in the First Action, Iglesias alleged that Chase, as the lender on both DOTs on the

---

**13.** Title 4A of the CA Article is the Limited Liability Company Act. CA section 4A301.1, captioned "Liability for negligence in rendering professional services," states in pertinent part that, when an individual employed by an LLC provides a "professional service," he or she is individually liable for negligent acts and omissions in the course of providing that service. The term "professional service" is defined as "a service that may lawfully be rendered only by a person licensed or otherwise authorized by a licensing unit in the State to render the service and that may not lawfully be rendered by a corporation under the Maryland General Corporation Law." CA § 5–101(g)(1).

English Turn Property, owed her a "duty of reasonable diligence and professional competence ... in providing funds to finance the sale" and that it breached that duty by "fail[ing] to make a diligent inquiry into the validity of the [Ramirez POA] upon which [Chase] financed the sale and encumbered [Iglesias]'s credit." On all counts, Iglesias sought damages in the amount of the full purchase price of the subject properties. (She did not allege that she would revoke her ownership interest in either property.)

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I & II

### Existence of a Legal Duty

Because, as we shall discuss, Iglesias's first two questions presented turn on the issue of the existence, nature, and extent of any legal duty of care owed to Iglesias by Chase, Pentagon, and/or Shin, we consider these issues together. The circuit court granted a motion to dismiss with respect to Chase and a motion for summary judgment with respect to Pentagon and Shin. Accordingly, we are guided by differing standards of review and concerned with differing facts in assessing the claims of error.

#### A. *Legal Background*

■ "Duty is a foundational element in a claim of negligence." *Pace v. State*, 425 Md. 145, 155, 38 A.3d 418 (2012). Whether a legal duty exists is a question of law. *Doe v. Pharmacia & Upjohn Co., Inc.*, 388 Md. 407, 414, 879 A.2d 1088 (2005). "There is no precise formula for determining the existence of a duty of care between two parties." *Griesi v. Atlantic Gen. Hosp. Corp.*, 360 Md. 1, 12, 756 A.2d 548 (2000). The determination "begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Prosser and Keeton on The Law of*

*Torts,* § 53, at 357 (5th ed. 1984). In deciding the issue of duty, Maryland courts have adopted "an analytical approach that encompasses at least two major assessments: examining the nature of the legal relationship between the parties and the likely harm that results from a party's failure to exercise reasonable care within that relationship." *Griesi,* 360 Md. at 12, 756 A.2d 548.

In the seminal case of *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (1986), the Court explained:

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

307 Md. at 534–35, 515 A.2d 756 (footnote and citations omitted.)

In *Jacques,* the plaintiffs, a married couple, entered into a residential sales contract to purchase a house. Under the contract, the Jacqueses were to make a cash down payment and obtain financing for the balance of the contract price. The contract was contingent upon the Jacqueses obtaining financing through a conventional 30–year loan bearing a fixed interest rate of 12–1/4% or less, and secured by a deed of trust. In a handwritten addendum to the contract, however, the Jacqueses agreed to "increase the down payment to whatever amount is necessary to qualify for a mortgage loan." *Id.* at 529, 515 A.2d 756.

The Jacqueses submitted an application to First National Bank ("the Bank") seeking a loan in accordance with the terms of the sales contract. They attached a copy of the contract and its addendum. By letter, the Bank acknowledged receipt of the application, locked in a rate of 11–7/8% for 90 days, and agreed to process the application. Several weeks later, the Bank informed the Jacqueses that they only

qualified for a loan in an amount significantly less than the amount to be financed. Despite the Jacqueses's protests, the Bank refused to revisit its determination in that regard and also refused to issue an "outright refusal" of the loan application. *Id.* at 530, 515 A.2d 756.

As required by the addendum to the sales contract, the Jacqueses accepted the loan the Bank was willing to give them and otherwise financed the purchase with personal loans from family members and an additional short-term personal loan from the Bank. They then sued the Bank for, among other things, negligence in the processing of their loan application. The case was tried to a jury, which returned a verdict in favor of the Jacqueses, awarding them $10,000 in compensatory damages.

Unhappy with the amount of the verdict, the Jacqueses noted an appeal, arguing that the trial court had erred in instructing the jurors on their (the Jacqueses') duty to mitigate their damages. The Bank cross-appealed, arguing that it did not owe any duty of care to the Jacqueses, as a matter of law. This Court reversed the judgment, holding that the Bank had no legal duty to use due care in evaluating an application for a loan. *Jacques v. First National Bank,* 62 Md.App. 54, 488 A.2d 210 (1985). The Court of Appeals granted *certiorari* and reversed. As noted above, the *Jacques* Court enunciated the principle that, when conduct creates the risk of economic loss (as opposed to the risk of personal injury), a tort duty of care will be found to exist when, and only when, there is an "intimate nexus" between the parties. *Jacques,* 307 Md. at 534, 515 A.2d 756. A showing of "contractual privity or its equivalent" satisfies the "intimate nexus" requirement. *Id.* at 534–35, 515 A.2d 756.

To elucidate this principle, the Court turned to two seminal decisions of the New York Court of Appeals (both authored by Justice Cardozo) bearing on the meaning of "intimate nexus." In the first, *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), the court held that a public bean weigher could be liable in negligence to the purchaser of beans even though the

bean weigher was in contractual privity only with the seller of beans. The *Glanzer* court reasoned that the purchaser was the "intended beneficiary" of the contract between the bean seller and the public weigher. 307 Md. at 535, 515 A.2d 756. In contrast, in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), the New York court held that "public accountants who carelessly prepared and certified a balance sheet for a corporation could not be held liable in negligence to a factor who made loans to the corporation in reliance upon the balance sheet." *Jacques*, 307 Md. at 536, 515 A.2d 756. In *Ultramares*, the court distinguished *Glanzer*, emphasizing the absence of any " 'contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants ... to the indeterminate class of persons who ... might deal with the [corporation] in reliance on the audit.' " *Id.* (quoting *Ultramares*, 255 N.Y. at 183, 174 N.E. 441 (alteration in *Jacques* )). The *Jacques* Court reasoned, based on *Glanzer* and *Ultramares*, that, with respect to a legal duty in tort, there exists "an inverse correlation ... between the nature of the risk on the one hand, and the relationship of the parties on the other.... [A]s the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty." *Id.* at 537, 515 A.2d 756.

Turning to the Jacqueses' claim, which plainly involved only economic loss, the Court had no difficulty in concluding that the Jacqueses were in contractual privity with the Bank. The Bank had expressly promised the Jacqueses that it would lock in a particular interest rate for 90 days and process their application; and in consideration for these promises the Jacqueses had paid the Bank appraisal and credit report fees. The Court concluded that it was implicit in the Bank's promise to process the Jacqueses' application that it would do so with reasonable care. Addressing the ultimate question, "whether a concomitant tort duty should be recognized under these circumstances," the Court observed that, given the "rather extraordinary financing provisions" in the Jacqueses' sales contract (which were known to the Bank and incorporated into the loan application), the Jacqueses were "particularly vulner-

able and dependant upon the Bank's exercise of due care." 307 Md. at 540, 515 A.2d 756. This vulnerability, coupled with the "public nature" of the banking industry, led the Court to conclude that a tort duty should be recognized. *Id.* at 542, 515 A.2d 756.

Because the Court held that the Jacqueses were in contractual privity with the Bank, it did not have occasion to consider the nature of "equivalent" relationships that might otherwise satisfy the "intimate nexus" requirement and give rise to a tort duty. The Court of Appeals has since addressed that issue in a series of decisions. In *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988), the Court held that statements by a prospective employer to a prospective employee in precontractual negotiations can give rise to a duty on the prospective employer's part to use only accurate statements about the company and the position. The *Weisman* Court emphasized that "the circumstances under which the two men [in that case] came together in precontractual negotiations created a sufficiently close nexus or relationship as to impose a duty" largely because the potential employer's goal was to persuade the potential employee to leave his current position to take the new job. *Id.* at 448, 540 A.2d 783. The Court observed that the face-to-face encounter between the parties "more closely resemble[d] the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship." *Id.* at 449, 540 A.2d 783.

Twelve years later, in *Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 762 A.2d 582 (2000), the Court held that an accounting firm engaged by a company to perform audits and prepare financial statements owed a duty of care to individuals who made loans to the company in reliance upon the financial statements. The president of the company in question—Magnetics, Inc.—was the plaintiffs' son. Before making the loans, the plaintiffs met face-to-face with their son and members of the accounting firm to discuss the financial status of Magnetics. Magnetics later failed after accounting irregularities surfaced, causing its principal lender to call its loan. The plaintiffs filed suit, alleging that the accounting

firm negligently overstated, by a factor of ten, Magnetics's inventory.

In analyzing whether the accounting firm owed a duty of care to the plaintiffs, the Court summarized the policy rationale underlying the principle that "contractual privity or its equivalent" must be shown:

[T]he reason for the requirement is to limit the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed. It was that concern that was being addressed by the *Jacques* Court when it juxtaposed *Glanzer* and *Ultramares* and stressed doubly that the Jacqueses were not strangers to the loan transaction and that the Bank promised the Jacqueses to process their loan application and to lock in a certain rate of interest for a period of time. *Jacques,* at 537, 515 A.2d at 761. Concerning the promises, the Court pointed out that they were an inducement to the Jacqueses and provided the Bank with a business advantage when the Jacqueses acted in conformance with them. *See id.*

361 Md. at 671–72, 762 A.2d 582 (footnote omitted).

The *Walpert* Court emphasized that, in *Glanzer*, "the plaintiffs' identity, or at least the class in which they belonged, and that they were going to use, and therefore rely on, the information [*i.e.*, the weight of the beans], was actually known to the defendant"; by contrast, in *Ultramares*, "other than as a member of the public, the defendant had no relationship at all with the plaintiff that provided the defendant with any information bearing on its liability for negligence." *Id.* at 687, 762 A.2d 582. Ultimately, the *Walpert* Court concluded that the accounting firm's knowledge that the plaintiffs were relying upon the financial statements-derived from its face-to-face encounter with them-brought it within the rationale of *Glanzer* and served as the "equivalent of privity." [14]

---

**14.** The Court adopted a three-pronged test derived from *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483

In *Simmons v. Lennon,* 139 Md.App. 15, 773 A.2d 1064 (2001), this Court addressed the circumstances in which, absent actual privity of contract, the equivalent of privity may be found to support a tort duty of care. We distilled from the holdings in *Walpert, Weisman,* and other cases that

[t]he common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found, is that in each case the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did.

*Id.* at 40–41, 773 A.2d 1064. In *Simmons,* like in the instant case, the negligence claim arose from a fraud scheme. There, a secretary and an outside bookkeeper for an attorney, Simmons, conspired to defraud him. The secretary forged Simmons's name on numerous checks drawn on his escrow accounts and the bookkeeper doctored Simmons's accounts to hide the fraud. One of the forged checks was made payable to Michael Lennon as part of the purchase price of a used car Lennon sold to Simmons's secretary. Lennon previously had been romantically involved with the secretary, but had broken off their relationship after she forged his signature on credit card applications and used the fraudulently obtained credit cards to make purchases totaling $17,000. Lennon, a retired police officer, also worked for Simmons on a semi-regular basis as a private-process server. He thus was familiar with Simmons's signature.

_____

N.E.2d 110 (1985), to determine the nature and extent of an accountant's duty. Under that test, "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110. The *Walpert* Court had no difficulty in concluding, under the facts before it that the plaintiffs had met this test in that they had a face-to-face meeting with the accounting firm and made the accounting firm aware that they were relying upon the financial reports prepared by the firm in deciding whether to lend the company money.

Because Simmons relied on his bookkeeper to alert him to any discrepancies in his accounts, he did not discover the forgery scheme for more than two years. Ultimately, he sued Lennon for conversion and negligence. In support of his negligence claim, Simmons alleged that Lennon owed him a duty to report the forged check. The case was tried to a jury. The trial court granted judgment in favor of Lennon on the negligence count on the basis that he (Lennon) owed no legally cognizable duty to Simmons.

We affirmed the judgment on appeal. We focused on whether, as a matter of law, there could be "the equivalent" of contractual privity between Simmons and Lennon. We concluded that there were no facts to show that Simmons ever had "relied" on Lennon to discover forgeries or to otherwise monitor checks drawn from his escrow accounts. *Id.* at 41, 773 A.2d 1064. We also considered Simmons's arguments that the injury was foreseeable to Lennon when Lennon negotiated the forged check. We concluded, given that the drawer bank, not the drawer, ordinarily is responsible when it accepts a forged check, that it would not have been foreseeable to Lennon that Simmons would not have discovered the forgery in a timely manner.

### B. *Chase's Motion to Dismiss*

"The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal." *Bobo v. State*, 346 Md. 706, 716, 697 A.2d 1371 (1997). In reviewing the circuit court's grant of a motion to dismiss, " 'our task is confined to determining whether the trial court was legally correct in its decision to dismiss.' " *Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618, 994 A.2d 411 (2010) (quoting *McDaniel v. Am. Honda Fin. Corp.*, 400 Md. 75, 83, 926 A.2d 757 (2007)). "A motion to dismiss for failure to state a claim tests the sufficiency of the pleadings." *Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677, 681–82 n. 4, 870 A.2d 592 (2005). "A defendant asserts in such a motion that, despite the truth of the allegations, the plaintiff is barred from

recovery as a matter of law." *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 414, 823 A.2d 590 (2003). In ruling on such a motion, the court must "assume the truth of all well-pled facts in the complaint as well as the reasonable inferences that may be drawn from those relevant and material facts." *Id.*

Thus, we begin by setting forth the relevant factual allegations in the SAC in the First Action. Iglesias alleged that Chase was the lender on both DOTs associated with the English Turn Property and that, on August 3, 2006, under the authority of the Ramirez POA, Ramirez executed the DOTs and associated Notes in her name. She further alleged that she "did not authorize Mr. Ramirez to sign in that capacity, did not agree to be obligated on the debt, and was unaware of the documents until approximately September, 2006." She alleged that Chase "owed [her] a duty of reasonable diligence and professional competence . . . in providing funds to finance the sale of the [English Turn Property]." She asserted that Chase "had never met with or spoken to" her, and that Chase breached a duty of care to her when it "failed to make a diligent inquiry into the validity of the [Ramirez POA] upon which they financed the sale and encumbered [Iglesias]'s credit."

Chase moved to dismiss the SAC,[15] arguing that Iglesias failed to adequately plead duty, proximate causation, and damages. After hearing argument, the circuit court ruled as follows:

Well, I mean it is a very interesting issue, but I keep coming back to the fact that there's no privity of contract between these two parties. And what I'm being asked to do, perhaps properly, is to consider that there is a broader responsibility in light of the manner in which business is presently done nowadays regarding these mortgage transactions for the bank to investigate the applicant and make

---

15. Chase initially moved to dismiss the FAC. While its motion was pending, Iglesias filed her SAC. The SAC added Shin as a party, but did not otherwise alter any of the allegations of negligence against Chase.

sure, in fact, that the applicant is who the applicant represents that they are.

I'm just not prepared at this time to impose that duty upon the bank. This is a third party who was not known to the bank and it seems to me to add that extra layer to a financial transaction is not supported by any case law that I see. It's—I don't know how far their duty extends, what they would be expected to do.

They certainly have a downside, as well, to lending the money without ascertaining it. But I'm just reluctant to impose a duty, to protect members of the public from identify theft, on the part of a bank. There are certainly safeguards that are in place and there are other organizations within the settlement transaction who would be in a position to determine, as I understand it, whether or not the applicant was who, in fact, they represented they were or whether the power they represented that they had was, in fact, validly granted.

I just don't think in the first instance that this power, or this responsibility devolves upon the bank. I'm going to grant the motion to dismiss as to [ ] Chase without leave to amend.

■ Chase makes a threshold argument that, because Iglesias does not argue in her opening brief that the court erred in granting the motion to dismiss on the alternative grounds of proximate causation and damages, she has no basis to argue that the court erred in granting the motion on the issue of duty. Therefore, she has waived her right to challenge the grant of the motion to dismiss on appeal. In her reply brief, Iglesias responds that the court granted the motion to dismiss based entirely on a ruling that Chase owed no duty to Iglesias as a matter of law. We agree with Iglesias on this point.

Aside from a passing reference to the "elements" of negligence, in the hearing on the motion to dismiss, Chase's counsel devoted its entire argument to the issue of duty. Iglesias's counsel responded in kind. As recounted, *supra*, the court granted the motion to dismiss, announcing its ruling from the

bench. More than four months later, on September 2, 2010, the court entered an order dismissing the SAC against Chase. The order signed by the court was the draft order submitted by Chase with its motion. It provided, in pertinent part, that Chase's "Motion to Dismiss the [SAC] be, and the same hereby is, GRANTED for the reasons stated therein...." It is abundantly clear from the court's oral ruling, however, that its decision to grant the motion to dismiss was premised entirely upon its conclusion that Chase did not owe Iglesias a legal duty of care. Accordingly, we turn to the merits of Iglesias's claim of error on that point.

Iglesias contends, based on "broad principles," that Chase owed her a legal duty to "take reasonable steps" to ensure that the applicant in the loan transaction in this case was who she represented herself to be. Relying upon *Jacques*, she argues that banks are held to a "high degree of integrity and responsiveness to their public calling," 307 Md. at 542, 515 A.2d 756, and that "Maryland courts have not been reluctant to impose upon banks a duty of care with respect to those with whom the banks deal." Chase responds that the cases Iglesias cites are readily distinguishable on their facts. It argues, also in reliance upon *Jacques* and its progeny, that the cases establish that "communication within some degree of personal relationship" is necessary before an "intimate nexus" giving rise to a tort duty may be found. It further argues, citing the *Jacques* Court's "inverse correlation" analysis, that when, as here, Chase was disbursing loan proceeds, not receiving money, the risk of economic loss was "quite low," thus making the "intimacy" requirement "correspondingly high."

Because it is undisputed that Iglesias's claim is for economic loss only, we focus our inquiry on the nature of her relationship with Chase. There were several points of contact between Chase and the individuals purporting to act on behalf of Iglesias. First, a mortgage loan application was submitted to Chase representing facts about Iglesias's employment, income, assets, and liabilities. Based on these representations, Chase approved the application and agreed to extend two loans totaling $897,000 to a person it presumed to be Iglesias. The

loans were to be secured by two DOTs on the English Turn Property. Then, on August 3, 2006, after Ramirez executed the loan documents securing the two DOTs under the authority of a forged POA, Chase disbursed the mortgage loan funds. We do not understand Iglesias to be arguing, nor do the allegations in her SAC in the First Action support the argument, that Chase had a duty to verify her identity at such time as it received or approved the loan application. Rather, she appears to be arguing only that Chase owed her a duty of care to verify that she was the true party to the transaction after it learned that settlement would proceed without her personally appearing.

As the circuit court recognized, by virtue of the fraud that gave rise to all of Iglesias's claims, she was not an actual party to the loan transaction. She alleges that she had no knowledge of the transaction resulting in the two loans and DOTs in her name for the English Turn Property until September of 2006 and that she and Chase representatives never met or spoke. Thus, it is apparent on the facts alleged that Chase and Iglesias were not in actual contractual privity. We only are concerned, then, with whether the equivalent of privity reasonably could be found to exist on the facts alleged.

Iglesias suggests that, when, as here, representatives of a lending bank think the bank is in contractual privity with a borrower, and the bank acts on that basis, the equivalent of privity exists. She asks us to adopt the reasoning of the Supreme Court of Alabama to that effect. *See Patrick v. Union State Bank,* 681 So.2d 1364 (Ala.1996) (holding that when an imposter fraudulently opened a bank account in the plaintiff's name, the bank owed the plaintiff a duty of care based on its belief that it had a business relationship with her). She also contends that several Maryland cases support her assertion that banks are held to a high standard of conduct and generally owe a duty of care in their transactions with customers *and non-customers* alike. We begin by discussing the Maryland precedents.

We agree with Chase that two of the cases Iglesias cites have no bearing on this issue as they did not decide the question of duty. In the first case, *Saxon Mort. Servs. v. Harrison*, 186 Md.App. 228, 973 A.2d 841 (2009), after a fire caused damage to their property, the owners submitted a claim to their insurer. The declaration page of the insurance policy listed Saxon Mortgage Services as the "first mortgagee and/or loss payee." *Id.* at 236, 973 A.2d 841. After adjusting the claim, the insurer issued a check for $140,000, made payable to order of the owners of the property *and* Saxon *and* a second mortgagee "as their interests may appear." *Id.* The check was hand-delivered to one of the property owners, who, in turn, endorsed it to an attorney with a law firm. The law firm subsequently deposited the check in its account at Middleburg Bank ("the Bank"), which accepted it for deposit. While Saxon had neither endorsed the check nor authorized any person to endorse it on its behalf, the word "Saxon" was handwritten on the back of the check. The Bank did not contact Saxon or the insurer to confirm the validity of the purported endorsement and the check ultimately was paid. Saxon sued the Bank for conversion and negligence. After a jury trial, the court granted the Bank's motion for judgment on the negligence claim on the ground that Saxon failed to adduce sufficient evidence of the standard of care.

On appeal from that ruling, we opined:

In order to succeed on its claim for negligence . . ., [Saxon] was required to show that [the Bank] owed [Saxon] a duty which was breached when [the Bank] took the instrument for deposit upon a forged indorsement, thus injuring [Saxon]. **Assuming that [the Bank], as a depository bank, owed a legally cognizable duty of care to [Saxon], a co-payee—a proposition that [the Bank] does not appear to challenge**—we agree that [Saxon] was not required, under the facts of this case, to elicit expert testimony to prove . . . [t]he standard of care.

*Id.* at 287–88, 973 A.2d 841 (emphasis added). Thus, we did not analyze, much less decide, whether the Bank owed Saxon, a non-customer, a duty of care to discover the forged endorse-

ment and refuse to accept the check for deposit.[16] Likewise, in *Free State Bank & Trust Co. v. Ellis,* 45 Md.App. 159, 411 A.2d 1090 (1980), the second case Iglesias relies upon, the issue of duty was not raised on appeal. Moreover, in *Ellis,* unlike in the instant case, the plaintiff who sued the bank for negligence in releasing collateral securing a loan was an actual customer of the bank.

Finally, Iglesias points to *Chicago Title Ins. Co. v. Allfirst Bank,* 394 Md. 270, 905 A.2d 366 (2006), in which the Court determined that a depositary bank could be liable in negligence to a non-customer drawer of a check. There, First Equity Title Corporation, an agent for Chicago Title (collectively "First Equity"), conducted the settlement for a home refinance for one Mark Shannahan. A title examination revealed two liens against the property that had to be satisfied, including an indemnity DOT ("IDOT") granted by Shannahan for the benefit of Farmers Bank. The IDOT secured both a 1996 loan to Shannahan and a revolving line of credit. First Equity mistakenly believed, however, that the IDOT secured only the 1996 loan and that the line of credit was unsecured.

After settlement, First Equity forwarded a check to Farmers Bank to pay off the 1996 loan ("the first check") along with instructions to release the IDOT. It also delivered two checks to Shannahan. One check was made payable to Shannahan and represented his "cash out" and the other check ("the second check") was made payable to Farmers Bank in the amount of $40,760.83, the then-existing balance on the revolving line of credit. The second check was accompanied by a letter from First Equity to Farmers Bank directing it to pay off the line of credit. Even though the second check was made payable to Farmers Bank, Shannahan endorsed it in his name and presented it for deposit into his personal account at Farmers Bank. He did not present the letter from First Equity to Farmers Bank or otherwise instruct the bank that

---

16. Chase suggests in its brief that a duty of care likely would have arisen under the Maryland Commercial Code, which probably is why the issue was not raised in the circuit court.

the second check was intended to pay off his revolving line of credit. The bank teller took the check to the bank manager because the amount was "over her limit." *Id.* at 278, 905 A.2d 366. The bank manager called Shannahan into his office to discuss the check, noted that Farmers had a lien on Shannahan's property, and contacted a loan officer at Farmers who was familiar with Shannahan's accounts. According to the bank manager, the loan officer advised him to allow Shannahan to deposit the check into his personal account. The check was deposited and drawn on First Equity's account at AllFirst Bank.

Farmers Bank subsequently initiated foreclosure proceedings with respect to the IDOT because Shannahan's line of credit debt was in default. At that time, First Equity became aware that Farmers Bank had not applied the second check against the revolving line of credit debt and that it had a lien against the property secured by that debt. First Equity unsuccessfully attempted to have AllFirst recredit the amount of the second check to its account. Thereafter, it filed a declaratory judgment action against Farmers Bank and All-First. The circuit court found in favor of First Equity, concluding that Farmers Bank negligently failed to apply the second check to the line of credit. It ordered Farmers Bank to release the IDOT. On appeal to this Court, we reversed based in part on our conclusion that the circuit court failed to consider First Equity's contributory negligence. *Farmers Bank v. Chicago Title Ins. Co.*, 163 Md.App. 158, 877 A.2d 1145 (2005).

As relevant here, on *certiorari* the Court of Appeals considered whether First Equity could maintain an action in negligence against Farmers Bank as a matter of law. As "the failure [on Farmers Bank's part] to exercise due care create[d] a risk of economic loss only," that question turned on whether the relationship between Farmer's Bank and First Equity was sufficiently "intimate" to justify the imposition of a tort duty. 394 Md. at 296, 905 A.2d 366. Because First Equity was not a customer of Farmers Bank, the Court concluded that the

parties were not in contractual privity and turned to whether the "equivalent" of privity existed. The Court explained:

> We noted in *Walpert* that *Glanzer* "clearly recognizes that a defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care." *Walpert*, 361 Md. at 684, 762 A.2d at 603. In the instant case, Farmers Bank was aware that the check presented by Shannahan ... although endorsed by him ... was not made payable to [him]. When asked at trial what a branch manager was supposed to do when receiving a check ... "payable to itself with no other restrictions or instructions," [the president of Farmers Bank] responded that a bank officer or branch manager should make inquiries to the presenter on "how they wanted to use the funds" and should determine if the customer's request was reasonable. Despite [this] testimony that inquiries should be made ... the court ascertained ... that Shannahan was [not] asked any questions.

*Id.* at 297, 905 A.2d 366.

The Court emphasized the following facts: Farmers Bank previously had received the first check paying off the 1996 loan; the drawer of both the first and second checks was a title company; Shannahan's outstanding loans with Farmers Bank were secured by real property; and, finally, Farmers Bank had received a "payoff request" from Shannahan's new mortgage lender and had replied by identifying its two secured loans. According to the Court, all of these facts taken together should have put Farmers Bank on notice of the refinance and should have made it aware that the second check represented a payment on the revolving line of credit in connection with the same refinance. The Court reasoned that, under the circumstances, Farmers Bank should have known of First Equity's reliance, and therefore there was an "intimate nexus" between the parties. *Id.* at 298, 905 A.2d 366.

The Court summarized its holding as follows: "An action for negligence, where the damages are only economic, may be

brought by a non-customer drawer against a depositary bank, ... where duty is established by a sufficient intimate nexus between the depositary bank and the non-customer, through privity or its equivalent." *Id.* at 300, 905 A.2d 366. The Court noted that its holding applied only to "the specific facts of the instant case" and did not mean that the equivalent of privity always will exist between the drawer of a check and the depositary bank that receives the check. *Id.* at 299 n. 22, 905 A.2d 366.

We return to the instant case. As an initial matter, Iglesias does not allege in her SAC in the First Action that Chase knew prior to the closing on the English Turn Property that Iglesias would not be present for the closing. Nor does she allege that Chase approved, or even saw, the Ramirez POA.[17] But assuming that a reasonable inference could be drawn that Chase was advised that Ramirez would be appearing on behalf of Iglesias and that Chase reviewed a copy of the Ramirez POA, we still would conclude that Chase did not owe Iglesias a legally cognizable duty to verify the POA's accuracy.

Unlike in *Chicago Title*, where Farmers Bank permitted a customer to deposit a check made payable to the bank into the customer's personal account when the bank had knowledge of facts tending to put it on notice of First Equity's reliance, Iglesias does not allege any facts that would have put Chase on notice that the English Turn Property loan transaction was suspect. Iglesias's claim also does not resemble *Weisman* or *Walpert*, in which the "equivalent" of contractual privity was found to exist. In each of those cases, the parties met face-to-face and the defendant had specific knowledge that the plaintiff was taking actions in reliance on the defendant's conduct.

Here, Chase knew only that it was processing two mortgage loans in Iglesias's name for a residential real estate transaction. Iglesias did not allege, as was alleged in *Jacques*, a

---

**17.** During Shin's deposition, excerpts of which were before the circuit court on summary judgment with respect to Pentagon and Shin, counsel for Pentagon represented that the POA was approved by Chase prior to settlement.

breach by Chase arising out of the performance of contractual duties. She does not assert that Chase was careless in the processing of the fraudulent loan application or that it failed to timely disburse the loan proceeds. Rather, Iglesias's negligence allegations against Chase stem from the factual assertion that it proceeded with a loan transaction on the strength of a notarized POA without verifying that Iglesias had in fact signed the POA. Thus, Iglesias's assertion that Chase owed her a legal duty of care is based entirely upon Chase's *mistaken belief that it was in contractual privity with Iglesias.*

In essence, Iglesias urges us to hold that, by virtue of Chase's contractual relationship with her imposter, the equivalent of contractual privity existed between her and Chase. As mentioned above, the Supreme Court of Alabama so held in *Patrick v. Union State Bank,* 681 So.2d at 1364.

In that case, Bridgette Patrick's temporary driver's license, which did not display a photograph, was stolen. Using the stolen license, an imposter opened a bank account in Patrick's name. The imposter did not present a photo ID in doing so and the bank took no steps to verify the imposter's identity. The imposter wrote bad checks on the account totaling over $1,500. As a result, eleven local jurisdictions issued warrants for Patrick's arrest. She spent ten consecutive days confined in various jails on these warrants before the charges all were dismissed. Thereafter, she sued the bank for negligence. As in the instant case, the bank argued that it did not owe Patrick a duty of care because "there was absolutely no relationship between [it] and [ ] Patrick." *Id.* at 1369. In a 5–4 decision, the Alabama Supreme Court disagreed, holding that the bank could be held liable in negligence to Patrick. It opined:

> The bank undeniably thought it had a relationship with Ms. Patrick when it opened the account for, and gave checks to, an imposter; and the fact that the bank opened a checking account under the name "Bridgette LaShawn Patrick," under Ms. Patrick's Social Security number, and based solely upon the presentation of Ms. Patrick's temporary driver's license as identification, persuades us that there is some

relationship between the parties. The fact that the relationship defies common categorization does not mean that there is no relationship.

*Id.*

The *Patrick* court went on to conclude that the relationship between the parties should give rise to a tort duty because the fraudulent scheme and the injury to Patrick were "foreseeable" to the bank. It reasoned that the likely result of opening an account for an imposter would be the passing of worthless checks, which naturally could result in criminal charges and jail time for the innocent party in whose name the account was opened.

In *Patrick*, unlike in the instant case, there were circumstances tending to put the bank on notice that a fraud could be afoot. The imposter opened the account without a photo ID and the bank employee who opened the account "noticed that the imposter did not completely sign her last name on the account signature card." *Id.* Here, in contrast, Iglesias alleged only that the English Turn Property transaction was consummated on the strength of a forged POA. She did not allege any facts that would have put Chase on notice that the Ramirez POA, despite bearing a notarial seal, was a forgery. *See In re Baxter,* 320 B.R. 30 (Bkrtcy.D.Dist.Col.2004) (ordinarily no duty to look behind a facially valid POA).[18] Thus, even if we were persuaded by the reasoning of the *Patrick* decision, which has been widely rejected in other jurisdictions, *see Brunson v. Affinity Fed. Credit Union,* 199 N.J. 381, 401, 972 A.2d 1112 (N.J.2009) (stating that the "expansive holding in *Patrick* ... has met with near universal disapproval" and collecting cases), we nonetheless would conclude that, under the facts alleged in Iglesias's SAC in the First Action, Chase did not owe Iglesias a legal duty of care in lending her funds in the English Turn Property transaction.

---

**18.** We shall discuss *Baxter* in more detail, *infra,* with respect to Pentagon and Shin.

For all of these reasons, we hold that Iglesias did not allege facts demonstrating any relationship between herself and Chase, much less a relationship sufficiently intimate to justify the imposition of a tort duty. *Simmons*, 139 Md.App. at 40, 773 A.2d 1064. Accordingly, the motion to dismiss properly was granted.

## C. *Summary Judgment in Favor of Pentagon and Shin*

■ Iglesias next contends the circuit court erred in ruling that neither Pentagon nor Shin[19] owed her a duty of care to look behind the facially valid POAs in either of the real estate transactions at issue. She asserts that the evidence on the summary judgment record, viewed in a light most favorable to her as the non-moving party, generated a genuine dispute of material fact as to whether there were "red flags" in each transaction that gave rise to a legal duty on Pentagon's part to take steps to verify the validity of the Ramirez and Canales POAs. Pentagon responds that, as a matter of law, it owed no legal duty to Iglesias when, as here, it relied upon notarized POAs authorizing the subject transactions, and was working on behalf of the lenders.

In both the First and Second Actions, Iglesias moved for partial summary judgment on the issue of liability and Pentagon moved to dismiss the SAC or, alternatively, for summary judgment. In ruling on the motions, the court was presented with and considered evidence outside the pleadings, converting the motions into those for summary judgment. *See* Md. Rule 2–322(c) ("If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . . ").

We have set forth the standard of review of a decision to grant a motion for summary judgment as follows:

---

**19.** For the purposes of the ensuing discussion, we shall refer to the parties collectively as "Pentagon."

We review a circuit court's decision to grant summary judgment *de novo*. *Crickenberger v. Hyundai Motor America*, 404 Md. 37, 45, 944 A.2d 1136 (2008). Our review is two-fold. First, we determine whether there was or was not a genuine dispute of material fact on the summary judgment record. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294, 936 A.2d 343 (2007). A material fact is a fact that, if found one way or the other, will affect the outcome of the case. *Miller v. Bay City Property Owners Ass'n*, 393 Md. 620, 631, 903 A.2d 938 (2006). Second, if there is no genuine dispute of material fact, we determine whether the party that obtained summary judgment was entitled to judgment in its favor, as a matter of law. *Crickenberger, supra*, 404 Md. at 45, 944 A.2d 1136.

*Zitterbart v. Am. Suzuki Motor Corp.*, 182 Md.App. 495, 501–02, 958 A.2d 372, *cert. denied*, 406 Md. 581, 961 A.2d 555 (2008).

On August 16, 2010, the court held a hearing on the summary judgment motions. The facts before the court on summary judgment were, with limited exceptions, those set forth in the factual background we have recited above. There was no evidence on the summary judgment record that Pentagon deviated in any way from the lenders' closing instructions. As pertinent, there was no evidence (and indeed not even an allegation) that the lenders had not instructed Pentagon to draft the deeds so as to grant joint tile to the English Turn Property to Iglesias and Ramirez and joint title to the Sawyer Terrace Property to Iglesias and Canales when Iglesias was the only obligor on the notes and DOTs.[20]

---

**20.** All of the parties to these cases had copies of the lenders' written closing instructions for both settlements. The closing instructions were a part of Pentagon's settlement files, which were produced to the parties. The lenders' closing instructions were not included as exhibits to either Iglesias's or Pentagon's motions. At various times during oral argument on Chases's motion to dismiss and on the cross-motions for summary judgment, counsel for the parties referred to the lenders' instructions. At no time did any of them suggest that the closing instructions had not been followed or that the closing instructions did not call for Iglesias to be a joint owner but a sole obligor. On the

The court announced its ruling from the bench, ultimately concluding:

> There is nothing, it seems to me, even granting all inferences as I must in favor of the non-moving party, to show that those particular disparities [between the loan applications] amount to some red flag that would impose what otherwise would not be a duty as a legal matter on the settlement agent to now inquire into why there's a difference [between the loan applications]. So as I rule[d] with respect to the lender in this case, I don't believe there is any duty imposed by law as to a settlement agent [conducting settlement] to conduct further investigation absent some fraud that's being committed in their presence that simply cannot be ignored.
>
> I don't think there's any duty on the part of the settlement company to compare previous information they may have about a prospective borrower or buyer for whom they're performing a settlement. I just don't think it rises to that level here.

Iglesias maintains that, because Pentagon undertook to "provide professional services," it owed her a duty of reason-

---

contrary, what references were made to the lenders' closing instructions all were to the effect that Pentagon was conducting the closings pursuant to the lenders' instructions. Indeed, during the oral argument on the summary judgment motions, counsel for Iglesias referred to Pentagon as "the ones who, pursuant to the closing instructions from the lenders, are guiding this transaction through and pursuant to the closing instructions from the lenders are charged with making sure all the documents are filled out correctly, that the borrowers are identified." During the same argument, counsel for Pentagon pointed out that a "closing agent can rely upon the documents that the lender sent to them because it's the lender's money that's at stake and the settlement agent doesn't get anything out of this. They [Pentagon] got their fee for following the instructions of the lender."

Although the lenders' closing instructions are not in the record, and therefore we cannot inspect them, we must assume that the closing instructions directed Pentagon to draft the deeds as it did (with joint ownership) even though Iglesias was the sole obligor. There is no evidence to the contrary and it is inconceivable that, if the closing instructions had directed otherwise, no party would have pointed that out.

able care, and that duty required it, "at a bare minimum, [to] ascertain whether or not Iglesias was indeed an actual party to the transactions." As she did below, Iglesias argues that she was in contractual privity with Pentagon because Pentagon was compensated from the purchaser's funds at closing; or, alternatively, that the circumstances amounted to the equivalent of contractual privity. Pentagon responds that it did not represent the interests of the buyers *or* the sellers in the subject transactions; rather, its obligation was to carry out the lenders' instructions. Moreover, as the purpose of a POA is to "provide third parties with evidence of agency authority," it, as a third party to the transactions, was entitled to rely upon the fully executed and notarized POAs.

We think it is plain that Iglesias was not in contractual privity with Pentagon. That Pentagon received its fee out of the "purchaser's funds" at closing is of no moment. As already discussed, Iglesias takes the position that she was not a party to the subject transactions and did not authorize Ramirez, Canales, or any other person to contract to purchase the subject properties, apply for financing, or consummate the sales on her behalf. Iglesias cannot argue, on the one hand, that Pentagon owed her a duty to detect that she was not a true party to the transaction and, on the other hand, that she was in privity with Pentagon because she "paid" for its services out of funds borrowed fraudulently in her name.[21]

Thus, in deciding whether a duty of care existed, as a matter of law, we are again faced with the question whether there was the "equivalent" of contractual privity between Iglesias and Pentagon in the subject transactions. We understand Iglesias's argument on this point to be twofold.

---

**21.** Iglesias cites *Attorney Grievance Commission v. Lockhart,* 285 Md. 586, 597, 403 A.2d 1241 (1979), for the proposition that "[s]ettlement lawyers ... representing all interests ... must recognize that they have a special duty to all parties to the settlement." This case is inapposite. The Court of Appeals was concerned with duties owed under the Maryland Rules of Professional Conduct, not with tort duties. Moreover, it is undisputed in this case that, as a lawyer performing settlement services as an agent for Pentagon, Shin was not representing any party to either real estate transaction.

First, Iglesias suggests, as she did with respect to Chase, that Pentagon's mistaken belief that she was a party to the settlements constitutes the equivalent of privity. The reasons we already have explained as to why, in this circumstance, a lender's relationship with an imposter does not constitute the equivalent of privity apply with equal force to the relationship between a title company conducting a real estate closing and an imposter purchaser. Moreover, the relationship between Iglesias's imposter and Pentagon was even more attenuated than was the relationship between the imposter and Chase: whereas Chase believed itself to be in contractual privity with Iglesias's imposter, Pentagon did not enter into any contractual relationship with Iglesias *or* her imposter. Rather, it was acting as an agent for the lender in each transaction to facilitate the closing of the subject loans.

Second, as noted, Iglesias argues that "red flags" in each transaction put Pentagon on notice that the POAs were suspect, thus making it foreseeable that Iglesias was likely a victim of identity fraud, *i.e.*, might not in fact be a party to the property sales. In the English Turn Property transaction, Iglesias identifies as "red flags" the substitution of buyers three days before settlement; Ramirez's execution of the POA on the day of settlement; and the incorrect statement in the POA that the property was located in Prince George's County (instead of Montgomery County). With respect to the Sawyer Terrace Property transaction, Iglesias identifies as "red flags" the timing of the sale, just 28 days after the English Turn Property sale, and that the same buyer (Iglesias) was a party to both sales; that that buyer was not present for settlement in either property sale, but was proceeding by means of a POA; that her "signature" on the Ramirez POA did not match her "signature" on the Canales POA; and that there were "irreconcilabl[e]" discrepancies between the loan applications in the two transactions regarding her purported employment, education, and income. Iglesias emphasizes with respect to both property sales that it was highly unusual that she as a

buyer was undertaking the sole obligation for the loans and DOTs but was obtaining only joint title to the properties.[22]

Iglesias asserts that these "red flags" should have put Pentagon on notice that fraud was afoot, and therefore created a circumstance akin to contractual privity, which gave rise to a duty on Pentagon's part to investigate whether a fraud was being perpetrated before allowing the sales to proceed. Iglesias attached to her own motion for summary judgment an affidavit by her designated expert witness, Emily Gumpert, an attorney and licensed settlement agent, averring *inter alia* that Pentagon should have, "at a minimum," compared Iglesias's signature on the POAs to a "known and reliable official signature"; that the POA notarized on the same day of settlement "required further investigation"; and that the "involvement of a single buyer in two residential/owner occupancy transactions within the same month is a cause for concern...."[23]

In arguing the issue of duty, the parties cite two cases bearing on the effect of a facially valid POA. In *Crosby v. Loudoun Nat'l Bank*, 235 F.2d 540 (4th Cir.1956), Agnes Crosby signed a POA authorizing one James King to act as her agent in the management of her farm and empowering him to "execute notes, contracts or deeds of trust securing

---

**22.** As discussed above, there was no evidence that the lenders did not instruct Pentagon to draft the deeds for joint ownership.

**23.** Ms. Gumpert also attested that Pentagon had a duty to review the contract of sale, settlement sheet, POA, and loan application to ensure that the parties to these documents were the same as the parties "proposed to be included on any Deed and Deed of Trust"; and that any difference between the parties named on these documents warranted "additional investigation to clarify any discrepancy." As explained *supra*, even though the lenders' closing instructions for both transactions are not in the record, it is evident that the closing instructions called for Iglesias and one other person to be granted the properties jointly, by deed, even though Iglesias was the only person obligated on the notes and DOTs for the properties. During the litigation, all the parties and counsel had the lenders' closing instructions in hand, there was no allegation or argument that the closing instructions were not followed, and the oral argument made plain that the closing instructions were followed.

said notes for the purchase of live stock, cattle, cows, hogs etc. to be fed and/or grazed on said farm." *Id.* at 541. It later became apparent that, for some time, King had been borrowing money under the strength of the POA, but converting the funds to his own use instead of applying the proceeds to the purchase of livestock. Crosby sued the lending bank, arguing that it owed her a legal duty "to make certain that whenever a note was accepted or renewed the cattle were on hand as security." *Id.* at 542–43. Holding that no such duty existed, the Court of Appeals for the Fourth Circuit explained:

> The legal principle applicable to the foregoing part of the case is that under broad powers of attorney such as these a third party is not obliged to go behind the power; the agent becomes trustee for his principal, and a lender is not obligated to [e]nsure the proper application of the loaned funds.

*Id.* at 543 (footnote omitted).

In a much more recent case, *In re Baxter,* 320 B.R. 30, in an adversary proceeding brought within a bankruptcy case, the United States Bankruptcy Court for the District of Columbia considered a negligence claim similar to that pursued by Iglesias. Maxine Baxter owned a house in Washington, D.C. Her son, Garrett, forged her name on a Limited Power of Attorney ("LPOA") authorizing him to refinance the existing mortgage on the house and encumber it with a new mortgage of $99,000. As relevant to our discussion, the court held that neither the lender nor the settlement company in the refinancing transaction had an obligation to look behind the facially valid LPOA. The court emphasized that the LPOA was properly notarized; that it was quite ordinary for a son to be authorized to act on behalf of his mother; and that there was "no evidence that the movants were in any way on notice that there might be a problem with the facially valid [LPOA]." *Id.* at 36. The court opined that "a negligence claim ought not to lie against a lender and a closing attorney who, in good faith reliance upon a notarized power of attorney (unbeknownst to them to contain a forged signature of the donor of the power)

permit a deed of trust executed by the purported attorney-in-fact to be recorded." *Id.*

Iglesias maintains that the "red flags" she alleges justify a departure from the holdings in *Crosby* and *Baxter.* She argues that the *Baxter* court suggested as much by pointing out that there were no facts that cast doubt on the "facially valid [LPOA]." Here, according to Iglesias, such facts existed, and therefore Pentagon could not reasonably rely upon the Ramirez and Canales POAs.

Under the reasoning of *Jacques* and *Walpert,* the "red flags" Iglesias points to only would be material if they served to put Pentagon on notice that Iglesias likely was the victim of identity fraud, thus enlightening Pentagon to the fact that she would be relying upon it to protect her interests. *See also Simmons, supra* (plaintiff presented no evidence that he relied on defendant to detect fraud or that defendant would have reasonably foreseen the injury to the plaintiff). Both the Ramirez and Canales POAs were fully executed and notarized. Each authorized the designated attorney-in-fact to execute documents in connection with the specific real estate transaction at issue. Both were thus facially valid and, under *Crosby* and *Baxter,* Pentagon ordinarily would be under no duty to inquire behind the power.

With respect to the First Action, the sum total of the "red flags" that, according to Iglesias, should have put Pentagon on notice that she was being defrauded were that the POA was executed on the same day as closing, Iglesias was substituted as a buyer shortly before closing, Iglesias was the sole obligor on the mortgage loans, and the Ramirez POA improperly identified the county where the English Turn Property was located. There is nothing about the date that Iglesias was substituted as a buyer or the mistake in identifying the county in the POA that suggests fraud. And, as we have explained, the closing instructions from the lenders must have called for Iglesias to be the sole obligor on the notes and DOTs, as there was no evidence to the contrary and all counsel proceeded on the premise that the closing instructions were followed. Pen-

tagon thus would have no reason to suspect a fraud against Iglesias based on her being the sole obligor but a joint owner for both properties. Whether viewed individually or cumulatively, these are not facts that would cause a settlement agent to suspect that an identity fraud was being perpetrated, much less to suspect that the facially valid POAs were forged.

With respect to the Second Action, the "irreconcilable discrepancies" Iglesias points out all appear in the loan documents prepared by the lender. As the settlement agent, Pentagon was not charged with a duty to compare or investigate the lenders' closing documents. Again, its obligation was to carry out the lenders' instructions and, as discussed, there is nothing in the summary judgment record to show that Pentagon did not do so. Moreover, Iglesias presented no evidence on the summary judgment record that agents of Pentagon realized that the Maria Iglesias purchasing the Sawyer Terrace Property was the same Maria Iglesias involved in the English Turn Property settlement; that they should have had mechanisms in place to alert them to such a fact; or that, if alerted, Pentagon would have been on notice of fraud. In sum, none of the facts Iglesias points to were sufficiently unusual to put Pentagon on notice that a fraud was being committed and that Iglesias was relying upon it to protect her from the fraud.

For all of these reasons, we conclude, as a matter of law, that the relationship between Pentagon and Iglesias was not sufficiently intimate to give rise to a tort duty of care; and there were no material facts in genuine dispute that otherwise would support a tort duty owed by Pentagon to Iglesias to inquire behind the facially valid POAs. Therefore, summary judgment properly was granted in favor of Pentagon.

### III.

### Motion for Default and Limitations Ruling

Finally, Iglesias contends the circuit court erred in declining to enter a default judgment against Shin and in permitting

Shin to "untimely assert a statute of limitations defense under these circumstances." The pertinent facts are as follows.

On July 20, 2009, Iglesias filed her complaints in the First and Second Actions naming Pentagon, Chase, and various other parties as defendants. More than eight months later, on March 26, 2010, she filed her SACs in each action adding Shin as a party. On May 5, 2010, Shin, a Virginia resident, was served by private process server. More than sixty days later, on July 16, 2010, Iglesias requested that an order of default be entered against Shin for failure to plead. On July 23, 2010, Shin opposed the request for default and filed motions to dismiss the SAC and/or for summary judgment on the basis of limitations. At the outset of the August 16, 2010 hearing on the pending dispositive motions, the court denied the requests for default against Shin, opining that it took the view that "once the answer is filed, it's moot." The court ultimately concluded that Iglesias's action against Shin was barred by the three-year statute of limitations and, alternatively, as already discussed, that Shin, sued solely in her capacity as an agent of Pentagon, owed no duty of care to Iglesias as a matter of law.

Iglesias contends it was an abuse of discretion for the circuit court not to enter an order of default against Shin because the only reason Shin gave for her failure to plead was her counsel's assertion that he did not learn that she had been served until July 16, 2010. We perceive no abuse of discretion. *See Holly Hall Publ'ns v. County Banking and Trust Co.*, 147 Md.App. 251, 267, 807 A.2d 1201 (2002) ("[T]he Maryland Rules and caselaw contain a preference for a determination of claims on their merits; they do not favor imposition of the ultimate sanction absent clear support."). We also reject Iglesias's contention, made without reference to any legal citation, that Shin should not have been permitted to raise an "untimely" statute of limitations defense.

Finally, Iglesias's suggestion that her cause of action against Shin did not accrue until March 24, 2010, when she discovered Shin's involvement in the subject transactions, also

lacks merit.[24] Iglesias acknowledged that she became aware of the subject transactions in September of 2006 and that she knew that a settlement agent had performed the closings on the sales of the properties. The circuit court ruled that there was "one injury here" and that Iglesias's late discovery that Shin was an "agent[ ] of that injury" did not affect when her cause of action accrued. We agree.

It is well established that a cause of action accrues for purposes of limitations at the time of the injury or, if the injury is unknown to the plaintiff, at such time as the plaintiff discovers that he or she has been injured. *See Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981). Thus, a plaintiff "will be charged with notice, and the statute will begin to run when: 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' " *Jacobs v. Flynn,* 131 Md.App. 342, 361–62, 749 A.2d 174 (2000) (quoting *O'Hara v. Kovens,* 305 Md. 280, 287, 503 A.2d 1313 (1986), in turn quoting *Poffenberger,* 290 Md. at 637, 431 A.2d 677) (alteration in *Poffenberger* ).

At the very latest, Iglesias's cause of action against Pentagon, and hence against Shin, accrued in September of 2006. Only under unusual facts not present here may a plaintiff's late discovery of the *identity* of an alleged tortfeasor delay the running of the statute of limitations. *See Jacobs,* 131 Md.App. at 360–68, 749 A.2d 174. As Iglesias did not amend her complaint to add Shin as a defendant until March of 2010, three years and six months after her cause of action accrued, her claim against Shin was barred by limitations. Thus, we also would affirm the grant of summary judgment in favor of Shin on that basis.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**24.** March 24, 2010 is the date that Iglesias deposed Shin as Pentagon's representative.