*Bel Air Carpet, Inc. v. Korey Homes Building Group, LLC, et al.*
No. 1006, Sept. Term, 2019
Opinion by Leahy, J.

**Negligence > Duty of Care > Economic Loss Doctrine**

Maryland has adopted the economic loss doctrine, which generally precludes tort liability for "negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611 (2017).

**Negligence > Duty of Care > Economic Loss Doctrine > Intimate Nexus**

"Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 525 (2014) (quoting *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 214 (2013)). "This intimate nexus is satisfied by contractual privity or its equivalent." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534-35 (1986).

**Negligence > Duty of Care > Economic Loss Doctrine > Intimate Nexus**

In concluding our survey of the intimate nexus test, we quote Judge Adkins's observation about the level of conduct linking the plaintiff to the defendant that is required to establish an intimate nexus:

> These cases illustrate that regardless of whether we apply the *Credit Alliance/Walpert* test, our privity-equivalent analysis in economic loss cases looks for linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance. This means, of course, that context is critical.

*Balfour Beatty*, 451 Md. at 620-21.

**Negligence > Duty of Care > Economic Loss Doctrine > Intimate Nexus > Construction Industry > Lender**

We conclude that Maryland law does not recognize a general duty on the homeowner's lender to ensure that the general contractor on a home construction project pays all of its subcontractors for work completed when the lender disburses funds to the general contractor, and where there is no privity of contract or intimate nexus between the lender and the subcontractors. The public policy of Maryland and other states disfavor imposing such a general duty of care on home construction lenders. As we note above, it would be

"manifestly unfair" to make lenders the "insurer of the subcontractors' interests" by imposing a general duty on lenders to ensure that general contractors properly pay unknown subcontractors for their work. *See Richard F. Kline, Inc. v. Signet Bank/Maryland*, 102 Md. App. 727, 733 (1995).

**Negligence > Duty of Care > Economic Loss Doctrine > Intimate Nexus > Pleading Requirements**

We hold that Bel Air Carpet has failed to allege a cognizable duty of care owed to it by Hamilton Bank because Bel Air Carpet does not allege privity or any equivalent intimate nexus in the complaint. The complaint does not allege the necessary "linking conduct" between the parties to justify Bel Air Carpet's reliance that Hamilton Bank would ensure that its borrower's funds were paid to Bel Air Carpet.

**Negligence > Duty of Care > Economic Loss Doctrine > Intimate Nexus > Pleading Requirements**

As our review of our cases requiring an intimate nexus highlights, the plaintiff must allege "linking conduct" sufficient to "show the defendant knew or should have known of the plaintiff's reliance." *Balfour Beatty*, 451 Md. at 620-21. Nowhere in the complaint does Bel Air Carpet allege that Hamilton Bank made a specific promise or representation to perform an obligation for Bel Air Carpet's benefit or that Hamilton Bank knew that Bel Air Carpet was relying on it. Bel Air Carpet seeks to cure this defect by asserting a broad-based standard in the construction industry. Unfortunately for Bel Air Carpet, neither Maryland nor most other states recognize such a broad-based duty of care that requires a lender to ensure that subcontractors and suppliers are paid.

**Negligence > Duty of Care**

Although it may be foreseeable that Hamilton Bank's failure to request mechanic's lien releases or inspect the properties could harm Bel Air Carpet, unless Hamilton Bank owes Bel Air Carpet a duty, Hamilton Bank cannot be liable to Bel Air Carpet in negligence. *Ashburn v. Anne Arundel Co.*, 306 Md. 617, 628 (1986) ("[T]here is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured.").

Circuit Court for Harford County
Case No. C-12-CV-19-000151

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1006

September Term, 2019
_____

BEL AIR CARPET, INC.

v.

KOREY HOMES BUILDING GROUP, LLC,
ET AL.
_____

Kehoe,
Nazarian,
Leahy,

JJ.
_____

Opinion by Leahy, J.
_____

Filed: January 28, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The underlying lawsuit was brought by a subcontractor in the construction industry left unpaid at the end of a construction project.[1]  Appellant Bel Air Carpet, Inc. ("Bel Air Carpet") was one of the last subcontractors to complete work on a series of new homes built by Korey Home Building Group, LLC ("Korey Homes"), a custom home builder with its principal place of business in Harford County.  Bel Air Carpet filed a negligence action to recover damages in the Circuit Court for Harford County against Korey Homes and several other defendants.  This appeal concerns just one of the defendants in that action—appellee Hamilton Bank.[2]

The trial court granted Hamilton Bank's motion to dismiss the single count of negligence against it on the ground that the complaint failed to state a claim because Bel Air Carpet failed to allege any contractual relationship or intimate nexus between it and Hamilton Bank to establish a duty of care.  Upon a consent motion, the circuit court certified its order as final and appealable under Maryland Rule 2-602(b).

---

[1] Maryland has been grappling with the problem of unpaid contractors on construction projects since the time it became the seventh state to ratify the U.S. Constitution in 1788.  The General Assembly enacted the first mechanic's lien law in the United States in December 1791 to encourage the building of Washington, D.C. by granting contractors the ability to obtain a lien on property to ensure payment for their work on a project.  1791 Md. Laws Ch. 45, § 10.

[2] After the litigation was commenced, Orrstown Financial Services, Inc., the holding company for Orrstown Bank, acquired Hamilton Bancorp, Inc., which operated Hamilton Bank.  Hamilton Bank is now known as Orrstown Bank.  To avoid confusion, as the parties adopt in their briefs, we will continue to refer to the successor entity as Hamilton Bank.

Bel Air Carpet presents two questions for our review,[3] which we have recast as follows:

I.     Did the circuit court err in dismissing the negligence count against Hamilton Bank by finding, as a matter of law, that Hamilton Bank did not owe a duty of care to Bel Air Carpet?

II.    Did the circuit court err or abuse its discretion in dismissing the negligence count against Hamilton Bank prior to discovery?

Bel Air Carpet urges that we hold that Hamilton Bank owed a duty of care to the subcontractors of Korey Homes to ensure they were paid under the theory that Hamilton Bank should have required mechanics lien releases from all subcontractors and conducted independent inspections of the work. Maryland law does not support the imposition of such a duty, and we cannot step beyond the statutes and cases that the Maryland General Assembly and our Courts have established to create one. We further note that, because the existence of a duty is a legal determination, the circuit court did not abuse its discretion in dismissing the negligence count prior to discovery. Consequently, we affirm the judgment of the circuit court.

---

[3] The questions presented in Bel Air Carpet's opening brief are:

"1.    Whether a construction lender owes a duty of care to a subcontractor where that bank releases funds to a general contractor, a portion of which belongs to the subcontractor, without requiring lien releases from subcontractors or conducting inspections to ensure the work on the custom home had been completed, which are both standard lending industry practices and a contractual condition precedent to releasing the funds to the general contractor?

2.     Did the lower court err when it dismissed Bel Air Carpet's claim for negligence prior to discovery?"

2

# BACKGROUND[4]

Bel Air Carpet sells and installs flooring materials, including carpet, hardwood flooring and ceramic tile. As stated in Bel Air Carpet's complaint, "[f]rom on or about March 28, 2018 through July 14, 2018, [Bel Air Carpet] and Korey Homes entered into a contract whereby [Bel Air Carpet] provided materials and labor for the installation of flooring and wall materials to all of Korey Homes' private custom home contracts based upon building specifications provided by Korey Homes[.]" In total, Korey Homes placed orders to Bel Air Carpet to provide labor and material to install flooring at twelve different custom homes in Harford and Baltimore Counties. In return, Korey Homes "agreed to pay [Bel Air Carpet] out of the sums obtained either directly from the homeowners or through draws issued from the buyers' lenders, the collective sum of three-hundred thirteen thousand, nine-hundred dollars and fifty-two cents ($313,900.52) for all materials and labor."

Hamilton Bank financed seven of the twelve custom homes for which Bel Air Carpet supplied and installed flooring and related materials. Bel Air Carpet provided invoices to Korey Homes for its work on the seven homes financed by Hamilton Bank. These invoices totaled $171,167.29.

---

[4] As this appeal is from the grant of a motion to dismiss the negligence count for failure to state a claim upon which relief can be granted, the evidentiary background will "assume the truth of all well-pleaded facts and allegations in the complaint." *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 121 (2007) (citing *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531 (1995)).

Bel Air Carpet avers that it "provided all of the requested materials and labor" and "completed the work" for the twelve homes "in a good and workmanlike fashion." Despite submitting invoices for this work, Korey Homes never paid Bel Air Carpet.

**Mechanic's Liens**

In an attempt to recover its losses, Bel Air Carpet "retained [] counsel to protect its rights utilizing the Maryland Mechanic's Lien Statute in order to obtain payment of its outstanding invoices." In response, Korey Homes held a meeting on September 28, 2018 with approximately twenty subcontractors and informed them that Korey Homes had no funds to pay the amounts owed. However, Korey Homes also assured the subcontractors that it would contact each subcontractor to devise a plan to pay their invoices, although most invoices would need to be reduced. Korey Homes "implored the subcontractors in attendance to continue to work on Korey Homes' contracts and to refrain from filing mechanic's liens because the subcontractors, including [Bel Air Carpet], would receive 'pennies on the dollar' from the homeowners and because it was not the buyers' fault that Korey Homes did not pay the subcontractors[.]" Less than a week later, "on or about October 2, 2018, Korey Homes shuttered its doors and never communicated further with [Bel Air Carpet]."

**Complaint**

On February 15, 2019, Bel Air Carpet filed a seven-count complaint in the Circuit Court for Harford County against Korey Homes, the individual members of Korey Homes—Korey and Stacy Smith, and Hamilton Bank. The first six counts of the complaint included a breach of contract claim against Korey Homes and a variety of counts against

4

both Korey Homes and Korey and Stacy Smith: trover and conversion; constructive fraud and breach of fiduciary duty; intentional misrepresentation (fraud and deceit); violation of the Maryland Construction Trust Statute; and violation of the Maryland Custom Home Protection Act. The seventh count asserted a negligence claim against Hamilton Bank.

In its complaint, Bel Air Carpet alleged the following pertinent facts concerning Hamilton Bank under the heading "Facts":

- Korey Homes and Hamilton Bank had a relationship in which Hamilton Bank ignored most, if not all, standard financial practices in disbursing construction loan funds to Korey Homes on behalf of its borrowers. For example, Hamilton Bank did not require Korey Homes, Korey [Smith], or Stacy [Smith] . . . to obtain Mechanic's Lien Releases from its subcontractors before Hamilton Bank would issue draws to Korey Homes despite Hamilton Bank's explicit requirement that releases were a condition precedent to Korey Homes receiving draws. Hamilton Bank never required Korey Homes to furnish requisition orders prior to disbursement, which was also a condition precedent to Hamilton Bank issuing draws. Indeed, Hamilton did not require Korey Homes to show any evidence that Korey Homes completed its work or paid its subcontractors before Hamilton released additional funds to Korey Homes.

- In contrast to Hamilton Bank, other lenders required Korey Homes to obtain and forward Mechanic's Lien Releases before releasing draws.

- Hamilton Bank issued wires of its borrowers' funds based only [on] a phone call from Korey [Smith], without additional documentation from Korey Homes.

- Hamilton Bank wired hundreds of thousands of dollars to Korey Homes, some of which [Bel Air Carpet] had earned and was entitled to, into Korey Homes' operating account without obtaining any accountability from Korey Homes that Korey Homes used that money to pay its subcontractors.

In its negligence count against Hamilton Bank, Bel Air Carpet asserted that "Hamilton Bank owed a duty of care to [Bel Air Carpet] to ensure that the funds it disbursed

5

to Korey Homes w[ere], in fact, paid to [Bel Air Carpet]." Hamilton Bank breached its duty to Bel Air Carpet "by failing to obtain Mechanic's Lien Releases . . . for work performed and materials provided to its borrowers' custom homes," which was "standard industry practice." Bel Air Carpet claimed that their "losses proximately resulted from Hamilton Bank's breach of its duty of care."

**Motion to Dismiss**

On March 19, 2019, Hamilton Bank filed a motion to dismiss in the circuit court. In its memorandum in support of this motion, Hamilton Bank argued that Bel Air Carpet could not "prevail on its negligence claim against Hamilton Bank as a matter of law because Hamilton Bank had no obligation to ensure that Korey Homes paid subcontractors such as Bel Air [Carpet]."

Invoking the economic loss rule as articulated in *Jacques v. First National Bank of Maryland*, 307 Md. 527, 534 (1986), Hamilton Bank asserted that "[i]t is well-settled that, '[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.'" According to Hamilton Bank, due to the intimate nexus requirement, "courts have generally concluded that a lender does not owe a duty of care to non-customers such as Bel Air [Carpet]." Hamilton Bank averred that it did not have a contract with Bel Air Carpet and that Bel Air Carpet failed to allege "the **existence of *any* relationship** between itself and Hamilton Bank, let alone a close relationship of the type that could give rise to an 'intimate nexus.'" (Emphasis in original.) Relying on *Richard F. Kline, Inc. v. Signet Bank/Maryland*, 102 Md. App. 727, 735 (1995) and related cases

6

from other jurisdictions, Hamilton Bank argued that courts "uniformly hold[] that a construction lender does not owe any duty to a subcontractor, including a duty to ensure that the subcontractor is paid by the contractor that hired it."

Finally, Hamilton Bank asserted that, even if it owed a duty of care to Bel Air Carpet, the failure to obtain mechanics' lien releases would not breach that duty or ensure that the subcontractors would have been paid. Rather, "[w]hether or not subcontractors were ultimately paid depended solely upon whether Korey Homes paid them, either from its own funds or from the proceeds of the draws advanced to it by Hamilton Bank on behalf of the [borrowers]."

In its opposition, filed April 17, 2019, Bel Air Carpet argued that *Kline* was "inapposite to the facts of this case," because the "Court opined that Signet owed no duty to Kline based on the facts of that case and within the context of unjust enrichment." Bel Air Carpet asserted that it "brought a claim of negligence against Hamilton Bank for failing to ensure that its borrower's funds were utilized by the general contractor for their express intended purpose – to pay the subcontractors."

Bel Air Carpet averred that it set out a prima facie claim for negligence by alleging:

(1) Hamilton Bank had a duty to ensure that the funds it disbursed were utilized for their intended purposes; (2) [] Hamilton Bank breached its duty to [Bel Air Carpet] by failing to obtain mechanic's lien releases, as expressly required by Hamilton Bank and in compliance with standard industry practices, before issuing draw payments to [] Korey Homes; and (3) [] this breach of duty proximately caused damages in excess of $150,000.00.

Bel Air Carpet conceded there was no contractual privity between it and Hamilton Bank but averred that it had "adequately pled 'its equivalent.'" Specifically, relying on *Walpert,*

7

*Smullian & Blumental, P.A. v. Katz*, 361 Md. 645 (2000) and *Iglesias v. Pentagon Title & Escrow, LLC*, 206 Md. App. 624 (2012), Bel Air Carpet claimed that, because Hamilton Bank had an obligation to "ensure that its borrowers' funds were properly utilized," the bank "knew or should have known that Bel Air [Carpet] was likely to take some action based on what Hamilton Bank said or did." Bel Air Carpet asserted that public policy requires Hamilton Bank to be held liable because "[f]ollowing their own rules and industry standards would have minimized losses by everyone involved, including the subcontractors, and would have instilled trust that everyone's money was protected."

In reply, Hamilton Bank contended that the complaint "contains no allegations establishing the existence of an 'intimate nexus' . . . sufficient to constitute the 'equivalent' of contractual privity." Hamilton Bank noted that the complaint did not allege that it was aware that Bel Air Carpet was one of Korey Homes' subcontractors and asserted that the complaint "demonstrate[d] that Bel Air [Carpet] was a complete stranger whose existence was completely unknown to Hamilton Bank."

Hamilton Bank stated that it was "simply a conduit for monies owed by its borrowers to Korey Homes," and lambasted Bel Air Carpet's failure to cite legal authority for the proposition that a lender owes a duty to ensure that a general contractor uses disbursed funds to pay its subcontractors. According to Hamilton Bank, no such authority exists, and Bel Air Carpet's negligence claim was not supported by public policy. Specifically, relying on *Kline*, 102 Md. App. at 733, and cases from other jurisdictions, Hamilton Bank averred that "imposing a duty on construction lenders . . . to police the use

8

of funds disbursed to third parties" would "chill construction lending" and make the lender an "insurer of the subcontractors' interests."

On June 25, 2019, the circuit court held a hearing on Hamilton Bank's motion to dismiss. Counsel for the bank argued the points in the memoranda, adding that "in effect, the bank and Bel Air Carpet and all the other subcontractors are complete strangers." Although counsel pointed out that "there's really no case directly on point in Maryland," he cited *Kline* for the proposition that "[y]ou can't have a duty arising out of a relationship where the parties don't know each other and haven't had any prior dealings."

Counsel for Bel Air Carpet asserted that it "would be premature to dismiss [Bel Air Carpet's] claims," because discovery "would allow [Bel Air Carpet] and this [c]ourt to more appropriately respond to Hamilton Bank's contentions that no duty exists between it and Bel Air Carpet." The judge then questioned:

> Well, what do you expect, though, to find in those documents? Aren't they just typical loan documents that the homeowners have gone to the bank . . . in order to get the funds to build these homes? So, how would they know what subcontractors Korey Homes intend[ed] to use? How would the bank know that? Why would that be in any of the loan documents?

Counsel replied that the "loan documents w[ould] set forth the rules by which Hamilton Bank is going to issue the money . . . to Korey Homes intended for subcontractors." Further, counsel asserted that the cases cited by Hamilton Bank "turned on the loan agreement," which further supported Bel Air Carpet's contention that the motion was premature. Counsel then asserted that "by not following their own rules[,] [Hamilton Bank] harmed Bel Air Carpet to the tune of more than $150,000." Referencing back to *Walpert* and *Iglesias*, counsel submitted that while Hamilton Bank "may not have known

9

specifically that Bel Air Carpet was a subcontractor providing the work," it "knew a subcontractor like Bel Air Carpet could be harmed by their failure to follow the rules and the common practices of the industry." Finally, counsel argued that, had Hamilton Bank required mechanic's lien releases, any failure to pay subcontractors would have been caught earlier.

On rebuttal, counsel for Hamilton Bank asserted:

> [T]he bank's duty and the reason why the bank has progress payments and sends inspectors out before each draw and inspects to make sure the work is done is because that home is the bank's collateral, and the bank wants to make sure if it's [disbursing] $100,000 that $100,000 worth of work's been done. Once the work's been done and the money is [disbursed], then the bank and the homeowner are protected because the value is in the ground.

Counsel for Hamilton Bank avowed that Bel Air Carpet's "theory of recovery makes zero sense" because Bel Air Carpet admits that the work was completed, and "Korey Homes was paid for the carpet that was put in the house." The problem, counsel concluded, was "Korey Homes didn't turn around and pay Bel Air Carpet under its contract."

In response to a question from the court whether Hamilton Bank should have gotten a mechanic's lien release, counsel averred, pursuant to the Maryland Custom Home Statute, "the subcontractor cannot get a mechanic's lien against a custom home unless the owner is in default under the contract with the builder and has not paid the builder. . . . So, once the homeowner has paid the contractor. . . ., there is no liability. . . .The subcontractor, Bel Air Carpet, in this case, has to look to Korey Homes."

Ruling from the bench, the judge granted the motion to dismiss, explaining:

> In this case, on a motion to dismiss, the [c]ourt is required to assume the truth of all of the well-pleaded facts within the complaint and the attached

10

exhibits and any reasonable inferences that may be drawn from that, and in the light most favorable to the nonmoving party in this case, . . . the plaintiff here in this case.

[O]n a claim for negligence, one really critical element is that the plaintiff must show some duty on the part of the defendants to the plaintiffs, in this case, Hamilton Bank, having a duty to the plaintiff, Bel Air Carpet, Incorporated. Even if this case gets to trial, even if after discovery, I don't see how the plaintiff can do that.

In this case, just to use [counsel for Hamilton Bank's] words, the bank is just a conduit for the funds. But there is no special relationship, no nexus that establishes a duty between the bank and [Bel Air Carpet] in this case. And I agree that when I read the Custom Home Statute there's nothing that requires a mechanics lien or that permits a mechanics lien to be filed in this case or submitted in this case.

So, there has to be some sort of contractual privity, and there's none between these two parties in this case. That's a critical element that underpins [Bel Air Carpet's] complaint in this matter. And without the ability to show that nexus, it's not even a matter of just showing that there is some economic benefit that [Hamilton Bank] gained. I think that's a stretch in this case given that based on the contract that they had with the homeowners, they're required to make draws to the contractor, Korey Homes, in this case. But there's nothing, then, that gives the bank some special relationship with the contractor's subcontractor just because they're the ones that have the money, and they're the ones that have to pay out on it.

\* \* \*

And I agree there is no Maryland law on point, but in this case, I think the just general negligence law in this matter makes it clear that you have to have some duty that's breached in order for the Court to find that based on the four corners of the complaint, any of exhibits, and any of the reasonable inferences from that that there is going to be some duty that the bank owed to Bel Air Carpet. If that's the case, then every lender would do so, every lender would have that same obligation to every unknown subcontractor in this case, and that's not the intent of the public policy of any of the statutes, of any of the case law that requires that there be some duty.

So, in this case, finding that there is none, I am going to grant the motion to dismiss that the defendant, Hamilton Bank, has filed. I'll sign an order [to] that effect.

11

On June 25, the circuit court entered a written order granting Hamilton Bank's motion and dismissing the negligence count "WITH PREJUDICE AND WITHOUT LEAVE TO AMEND for failure to state a claim against Hamilton Bank upon which relief can be granted." On July 26, the parties filed a consent motion to certify the circuit court's order as a final and appealable judgment pursuant to Maryland Rule 2-602(b).[5] On July 29, the circuit court granted the consent motion, finding "that there is no just reason for delay," and ordered that the order granting the motion to dismiss "is hereby determined to be a final judgment as to [Bel Air Carpet's] claims against Hamilton Bank pursuant to Maryland Rule 2-602(b)."[6] Bel Air Carpet then noted a timely appeal on August 7, 2019.

## STANDARD OF REVIEW

Under Maryland Rule 2-322(b)(2), a defendant may seek a dismissal of a complaint if it fails "to state a claim upon which relief can be granted[.]" While generally confining its analysis to the "four corners of the complaint and its incorporated supporting exhibits,

---

[5] We have previously explained: "It is this Court's duty to examine a circuit court's certification decision under Maryland Rule 2-602." *Shofer v. Stuart Hack Co.*, 107 Md. App. 585, 591 (1996). Because the order is dispositive of Bel Air Carpet's entire claim against Hamilton Bank, certification was proper. *See Snowden v. Balt. Gas & Elec. Co.*, 300 Md. 555, 563 (1984) (Authorization is "limited to orders which, by their nature, have a characteristic of finality. Such orders must be completely dispositive of an entire claim or party.").

[6] Following the certification of the order as final and appealable, on July 30, 2019, Korey and Stacy Smith filed a suggestion of bankruptcy in the circuit court, indicating that they had filed for bankruptcy protection in the United States Bankruptcy Court for the District of South Carolina under Chapter 7 of the United States Bankruptcy Code. Consequently, pursuant to 11 U.S.C. § 362, further proceedings involving the Smiths were stayed.

if any," the trial court may grant a motion "only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action for which relief may be granted." *Floyd v. Mayor of Balt.*, 463 Md. 226, 241 (2019) (quoting *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 496–97 (2014)).[7]

We "review[] the grant of a motion to dismiss for legal correctness." *Rounds v. Maryland-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 635 (2015) (citing *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 95 (2014)). "In conducting this review, we assume the facts and allegations in the complaint, and any inferences that may be drawn from them, are true and view them in a light most favorable to the non-moving party." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 609 (2017) (citation omitted).

We review the denial of discovery for an abuse of discretion and will only conclude that the circuit court abused its discretion "'where no reasonable person would take the view adopted by the [trial] court [ ]' . . . or when the court acts 'without reference to any guiding principles,' and the ruling under consideration is 'clearly against the logic and

---

[7] Bel Air Carpet argues that it "properly relied upon Hamilton Bank's draw schedule," an exhibit to its memorandum, in opposing Hamilton Bank's motion to dismiss, and that the court considered the exhibits in dismissing the negligence count. These documents are not relevant for our review. The circuit court judge ruled on the motion to dismiss and limited herself, as she explained, to "the well-pleaded facts within the complaint and the attached exhibits." Consequently, the circuit court correctly "confine[d] [her] review . . . to the four corners of the complaint and its incorporating supporting exhibits, if any." *Rounds v. Maryland-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 636 (2015).

effect of facts and inferences before the court[ ]' . . . or when the ruling is 'violative of fact and logic.'" *Moser v. Heffington*, 465 Md. 381, 400 (2019) (quoting *Wilson v. Crane*, 385 Md. 185, 198 (2005)).

**DISCUSSION**

**I.**

**Negligence**

**A. Parties' Contentions**

Bel Air Carpet contends that it "set forth sufficient facts to form the basis of a prima facie negligence claim against Hamilton Bank and adequately pled the equivalent of contractual privity[.]" Specifically, relying on *Walpert, Smullian & Blumental, P.A. v. Katz*, 361 Md. 645 (2000) and *Iglesias v. Pentagon Title & Escrow, LLC*, 206 Md. App. 624 (2012), Bel Air Carpet avers that, because Hamilton Bank failed to follow "banking industry standards" and its own rules concerning how draws would be issued, it breached a duty to Bel Air Carpet. According to Bel Air Carpet, "had Hamilton Bank followed its own rules it would have 'control[led] the risk to which [it was] exposed' by simply obtaining mechanic's lien releases for all of the previous work completed under successor draws and/or issuing dual-payee checks to ensure its borrowers signed off and thereby knew what work was being paid."

Further, Bel Air Carpet argues that public policy "requires that construction lenders like Hamilton Bank be held accountable for their negligence" for two reasons. First, "it seems nonsensical for construction lenders . . . to set out the non-negotiable and steadfast rules of how it will hold and disburse funds from trust that belong to borrowers and

14

subcontractors, subsequently act in bad faith by violating those very rules, and then claim that it has no liability to anyone." Second, "[f]ollowing their own rules and industry standards would have minimized losses by everyone involved, including the subcontractors, and would have instilled trust that everyone's money was protected."

To the contrary, Hamilton Bank asserts that "Bel Air Carpet cannot maintain a negligence claim against [it] because no contractual privity or its equivalent existed between Bel Air Carpet and Hamilton Bank." Hamilton Bank contends that the complaint "demonstrates that Bel Air Carpet was a complete stranger" and that "Hamilton Bank's only duty was to remit to Korey Homes the funds that [its] borrowers directed[.]" Relying on *Richard F. Kline, Inc. v. Signet Bank/Maryland*, 102 Md. App. 727, 735 (1995) and related cases from other jurisdictions, Hamilton Bank avers that "a construction lender does not owe a duty to ensure that subcontractors working on a job that the lender is financing are paid for their work." Hamilton Bank urges that Bel Air Carpet's negligence claim is not supported by public policy. Citing *Kline*, 102 Md. App. at 733, and other cases, Hamilton Bank contends that the imposition of a duty to "police the funds disbursed to third parties" would "clearly chill construction lending."

In its reply, Bel Air Carpet directs us to an Ohio statute, which, Bel Air Carpet mistakenly asserts, "codifies a duty between a construction lender and a subcontractor, even where there is no direct contract between the parties."

## B. Foundational Elements

To sustain a cause of action for negligence in Maryland, a plaintiff must allege: (1) the defendant was under a duty to protect the plaintiff from harm; (2) a breach of that duty; (3) a causal relationship between the breach and the harm; and 4) the damages suffered. *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611 (2017); *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 213 (2013); *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655 (2000) (citing *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 531 (1986)). "Absent a duty of care, there can be no liability in negligence." *Walpert*, 361 Md. at 655.

Maryland has adopted Prosser and Keeton's characterization of "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *100 Inv. Ltd. P'ship*, 430 Md. at 213 (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53 (5th ed. 1984)). "To determine whether a duty exists in a particular context, we examine: (1) 'the nature of the harm likely to result from a failure to exercise due care,' and (2) 'the relationship that exists between the parties.'" *Id.* at 213-14 (citing *Jacques*, 307 Md. at 534). The Court of Appeals has discerned:

> an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty.

16

*Jacques*, 307 Md. at 537. "In essence, the determination of whether an actionable duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell v. Littlepage*, 413 Md. 96, 120 (2010). "Whether a legal duty exists between parties is a question of law to be decided by the court." *100 Inv. Ltd. P'ship*, 430 Md. at 211. Accordingly, the determination of a legal duty is particularly "an appropriate issue to be disposed of on motion for dismissal." *Iglesias v. Pentagon Title & Escrow*, 206 Md. App. 624, 644 (2012) (quoting *Bobo v. State*, 346 Md. 706, 716 (1997)).

### C. Duty, the Economic Loss Doctrine, and the Intimate Nexus

Maryland has adopted the economic loss doctrine, which generally precludes tort liability for "negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Balfour Beatty*, 451 Md. at 611. "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 525 (2014) (quoting *100 Inv. Ltd. P'ship*, 430 Md. at 214). "This intimate nexus is satisfied by contractual privity or its equivalent." *Jacques*, 307 Md. at 534-35. The Court of Appeals summarized the rationale of the intimate nexus requirement in *Walpert*:

> [T]he rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages emerges: to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Stated differently, the reason for the requirement is to limit the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed.

17

361 Md. at 671 (citation omitted).

Our appellate courts have, on many occasions, considered whether an "intimate nexus" presents a relationship sufficiently close to support a duty of care. Specifically, as we have noted, "[t]he intimate nexus analysis has been applied in Maryland to permit recovery of economic loss in suits between: a bank and its client, *see Jacques*, 307 Md. at 534-35; a title company and a purchaser of real property, *see 100 Inv. Ltd. P'ship v. Columbia Town Center Title Co.*, 430 Md. 197, 225 (2013); and an accounting firm and a third-party investor, *see Walpert*, 361 Md. at 693-94." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420, 447 (2016). In addition, our Courts have analyzed whether an intimate nexus existed in other scenarios, including in the context of a bank and a non-customer. *Chi. Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 300 (2006).

The Court of Appeals first adopted the intimate nexus test in *Jacques*, 307 Md. at 534-37. As a result, the Court held that a bank owed its customers a duty of reasonable care in the processing of a loan application where the bank expressly agreed to process the customers' application, received consideration for processing it, and agreed to "lock in" a specific interest rate, which was clearly "intended to entice the customer to deal with the offering bank." *Id.* at 528, 537-38. The customers in *Jacques* entered into a residential sales contract to purchase a house with a contingency that the customers obtain outside financing or forfeit a $10,000 deposit. *Id.* at 531. The customers then submitted an application for a loan from a bank in accordance with the terms of the contract. *Id.* at 529.

18

The bank agreed to process the loan, in exchange for $144 for the appraisal and credit report, and to lock in the interest rate for ninety days. *Id.* The bank determined that its customers qualified for an amount significantly less than necessary to complete the sale. *Id.* at 530. While the customers qualified for a much larger loan from a second lender, interest rates had escalated in the interim, and the customers were faced with the dilemma of whether to settle with the first bank at a lower interest rate and secure other loans to make up the difference or secure the loan from the second bank. *Id.* The customers proceeded to settlement with the first bank and then filed suit. *Id.*

In finding that there was an intimate nexus between the bank and the customers, the Court explained that the customers were "particularly vulnerable and dependent on the Bank's exercise of due care." *Id.* at 540. Specifically, "[i]n accepting the loan application for processing, the [b]ank had knowledge that [its customers] would be legally obligated to either proceed to settlement with the loan . . . or forfeit their deposit . . . and lose any benefit of their bargain." *Id.* Accordingly, the bank's duty emanated from both its relationship with the customer and the bank's knowledge that the customer relied on its services. *Id.* at 540-41. The Court further recognized the "public nature" of banking and held that "[t]he recognition of a tort duty of reasonable care under the circumstances presented in this case is . . . consistent with the policy of this State" and "reasonable in light of the nature of the banking industry and its relation to public welfare." *Id.* at 543.

The *Jacques* Court discussed two leading cases from New York, both authored by Justice Cardozo. In *Glanzer v. Shepard*, the Court of Appeals of New York held that "a public weigher of beans was liable to the buyer of the beans for negligence in the weighing,

19

notwithstanding that the weigher had been engaged and paid only by the seller." 135 N.E. 275, 276-77 (1922). Because the weigher held himself out as skilled and careful, the "assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed[.]" *Id.* at 276. Conversely, in *Ultramares Corp. v. Touche*, the Court held that accountants who carelessly prepared a balance sheet did not have the requisite nexus to a third-party corporation who made loans in reliance on the balance sheet to impose a duty of care. 174 N.E. 441, 447-48 (N.Y. 1931). In contrast to the weigher of beans, the accountant had no relationship with the third-party. While the accountants were generally on notice that third parties might rely on their reports, "[t]he range of transactions in which a certificate of audit might be expected to play a part was as indefinite and wide as the possibilities of the business that was mirrored in the summary[.]" *Id.* at 442.

In *Walpert*, our Court of Appeals held that the legal equivalent of privity to support a negligence claim existed between an accountant and a third party where, assuming the truth of certain facts for purposes of summary judgment, the accountant had knowledge that the third party would rely on that accountant's financial statement. 361 Md. at 692-94. The Court adopted the three-prong test for "privity equivalent" from *Credit Alliance Corp. v. Arthur Anderson*, 483 N.E.2d 110, 118 (N.Y. 1985), which required the plaintiff to "establish: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants'

20

understanding of that party or parties' reliance." *Walpert*, 361 Md. at 674. In adopting the *Credit Alliance* test, our Court of Appeals concluded that this three-part test would "limit[] the unpredictable and unlimited nature of economic damages." *Id.* at 675. The Court then determined that applying the test "to the facts *sub judice* produces a clear result[.]" *Id.* at 693. The Court focused on the accountant's knowledge of the third party's reliance. *Id.* at 693-94. Specifically, the Court noted that the accountant had met with the third party on "several occasions" and met with him to discuss [a business's] financial condition in order for the [third party] to determine whether to 'lend money[.]'" *Id.* at 694. The accountant "knew that the [third parties] had relied on information supplied by [the accountant] in deciding to lend monies to, or securing loans" for the accountant's client. *Id.* at 693. Accordingly, a dispute of material fact precluded the grant of summary judgment. *Id.* at 694.

Applying the privity equivalent test again six years later in *Chicago Title Insurance Co. v. Allfirst Bank*, the Court of Appeals found an intimate nexus between a third-party title company and drawer of a check and the depository bank. 394 Md. at 297-98. There, a title company sought to clear two deeds of trust, securing a loan and a line of credit, on a customer's house as part of a refinancing. *Id.* at 277-78. After receiving a check from the title company, the bank correctly closed the loan. *Id.* After settlement, the title company sent the customer a check, payable to the bank, with a letter instructing the bank to use those funds to close the line of credit. *Id.* at 278. The customer brought the check to the bank to deposit but did not include the instruction letter. *Id.* Instead of applying the funds to the outstanding balance to clear the line of credit, the bank credited the customer's

individual account. *Id.* at 278. When the customer defaulted on his loan, the bank sought to foreclose. *Id.* at 279. Consequently, the title company learned that the funds had been misapplied and the original mortgage had never been released. *Id.*

The Court of Appeals held that the equivalent of privity existed between the bank and title company. *Id.* at 297-98. Specifically, the Court of Appeals determined that the bank should have known the title company was relying on the bank to properly apply the funds. *Id.* at 297-98. The Court noted that the bank was already aware of the title company, having received and processed the first check to close the loan. *Id.* at 298. Not only had the bank provided the title company with a payoff amount to close the line of credit, its president testified that, when presented with a check payable to the bank without further instruction, the bank manager "should make inquiries to the presenter on 'how they wanted to use the funds.'" *Id.* at 297-98. The Court emphasized that its holding "[did] not impose liability on [the bank] to an indeterminate class of people for an indeterminate time, but rather, addresses a specific entity, [the title company], for this specific transaction." *Id.* at 299-300. *Chicago Title* is the only decision in which the Court of Appeals recognized an intimate nexus between a bank and a non-customer because the facts in that case demonstrated the "intimate" relationship necessary to establish a "privity equivalent."

The antipodal outcome was reached in *Iglesias* where the circuit court granted summary judgment on a negligence claim because the plaintiff had not alleged "facts demonstrating any relationship between herself and [the defendant bank], much less a relationship sufficiently intimate to justify the imposition of a tort duty." 206 Md. App. at 656. There, a loan officer engaged in a fraudulent scheme in which he and others forged

22

notarized powers of attorney to purchase two properties in Iglesias's name. *Id.* at 627-28.

After Iglesias discovered the fraud, she sued several parties involved with the real estate

settlement, including a negligence action against Pentagon, the title company that

conducted the real estate settlements. *Id.* at 628. The circuit court granted summary

judgment in favor of Pentagon, finding that the company did not owe a duty to Iglesias.

*Id.* at 629.

On appeal to this Court, Iglesias argued that the circuit court erred in finding that

Pentagon did not owe her a duty of care to look beyond the facially valid, but fraudulent,

powers of attorney used in the real estate transactions. *Id.* at 656. Because Pentagon

provided professional services, Pentagon had a duty to ascertain whether Iglesias was an

actual party to the transaction. *Id.* at 658-59. Iglesias argued both that she was in direct

contractual privity as well as the equivalent of contractual privity with Pentagon on two

grounds: first, based on Pentagon's mistaken belief that she was a party to the transaction;

and, second, because "red flags" put Pentagon on notice that the powers of attorney were

fraudulent, creating a duty on Pentagon's part to investigate whether she was a victim of

identity fraud. *Id.* at 659.

We held that the circuit court did not err in granting summary judgment. *Id.* at 656.

We concluded that Iglesias was not in contractual privity with Pentagon and that her

argument was self-defeating. *Id.* We reasoned:

> Iglesias cannot argue, on the one hand, that Pentagon owed her a duty to
> detect that she was not a true party to the transaction and, on the other hand,
> that she was in privity with Pentagon because she "paid" for its services out
> of funds borrowed fraudulently in her name.

*Id.*

Turning to Iglesias's alternative argument, we determined that Pentagon's mistaken belief was insufficient to create the privity-equivalent, in part, because the relationship between Iglesias's imposter and the Pentagon was too attenuated. *Id.* at 660. We ruled that the "red flags" would be material only "if they served to put Pentagon on notice that Iglesias likely was the victim of identity fraud, thus enlightening Pentagon to the fact that she would be relying upon it to protect her interests." *Id.* at 663 (citation omitted). The "red flags" in that case were insufficient to create privity. In sum, we concluded, "none of the facts Iglesias point[ed] to were sufficiently unusual to put Pentagon on notice that a fraud was being committed and that Iglesias was relying upon it to protect her from the fraud." *Id.* at 664.

In *Balfour Beatty*, both this Court and the Court of Appeals held that "in the absence of contractual privity, physical injury, or risk of physical injury, design professionals in large government construction projects do not owe a tort duty to those who bid for and contract with a government entity." 451 Md. at 604; *see also Balfour Beatty*, 226 Md. App. at 427 (same). There, the City of Baltimore contracted with an engineer to design upgrades to a water treatment plant. 451 Md. at 605. The City accepted a contractor's bid to complete the work required by the engineer's design. *Id*. During the construction, the contractor "encountered leaking and other problems, which resulted in delays and cost overruns." *Id.* at 606. The contractor filed a three-count complaint for professional negligence, negligent misrepresentation, and a claim under Restatement (Second) of Torts § 552 against the engineer to recover damages for its loss. *Id.* The engineer filed a motion

24

to dismiss for failure to state a claim because "without privity between the parties, no legally cognizable tort duty ran from Engineer to Contractor that would permit recovery of purely economic losses." *Id.* at 607. After oral argument, the circuit court granted the engineer's motion because of the lack of privity, and we affirmed. *Id.* at 608. The Court of Appeals then granted certiorari to consider, among other things, whether "the economic loss doctrine bar[s] a general contractor's professional negligence claim against a design professional on a government construction project under the privity-equivalent analysis of the intimate nexus test[.]" *Id.*

After reviewing the evolution of the economic loss doctrine and the intimate nexus test, the Court of Appeals "decline[d] to extend the privity-equivalent intimate nexus test to design professionals on government construction projects." *Id.* at 627. Central to the Court's decision was the "complex web of contracts that typically undergird a public construction project," which offers contractors "sufficient opportunity to protect themselves (and anticipate their liability) in negotiating these contracts." *Id.* at 626. "In the context of larger construction projects, . . . parties typically rely on a network of contracts to allocate their risks, duties, and remedies . . . and do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it." *Id.* (quoting *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004)). Further, the Court was "mindful that government contracts have a special consideration—the public purse. Imposing a tort duty on design professionals will likely correlate with an increase in project costs and with a corresponding rise in price for government entities." *Id.* at 626-27. Accordingly, the "complex web of

25

contractual arrangements" in public construction projects "predominates" and precludes "injecting a tort duty" against the public interest.  *Id.* at 630.

In concluding our survey of the intimate nexus test, we quote Judge Adkins's observation about the level of conduct linking the plaintiff to the defendant that is required to establish an intimate nexus:

> These cases illustrate that regardless of whether we apply the *Credit Alliance/Walpert* test, our privity-equivalent analysis in economic loss cases looks for linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance. This means, of course, that context is critical.

*Balfour Beatty*, 451 Md. at 620-21.

### D.  Construction Lenders and Duty

Returning to our threshold consideration, we have found no reported decision in Maryland that squarely answers whether a lender owes a duty to ensure that a subcontractor receives payment from its disbursements to the general contractor absent any contractual obligation to do so.  Further, our courts have not yet had the opportunity to apply the "privity equivalent" test in a negligence action against a lender for economic damages resulting from an alleged failure to ensure that subcontractors are paid for their work.

*Richard F. Kline, Inc. v. Signet Bank/Maryland*, 102 Md. App. 727 (1995), represents perhaps the clearest enunciation from our courts of a lender's duty to a subcontractor.  In *Kline*, we addressed, as a matter of first impression, whether "a construction lender was unjustly enriched where the subcontractor was unable to obtain a mechanic's lien or seek damages for breach of contract because the general contractor was in bankruptcy."  *Id.* at 731.  The subcontractor averred that the lender knew that the

26

developer, the lender's borrower, had defaulted on the project but, instead of informing the subcontractors, paid none of the subcontractors and increased the value of its collateral. *Id.* at 729. After setting out the elements of unjust enrichment, this Court summarized that a "party seeking recovery under the doctrine of unjust enrichment 'must demonstrate that the [third party] has in fact been benefitted[.]'" *Id.* at 733 (citing *Meehan v. Cheltenham Township*, 189 A.2d 593, 595 (1963)). Further, we noted that "in the absence of some misleading by the third party, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third party." *Id.* (quoting *Meehan*, 189 A.2d at 596). Consequently, we recognized that "it would be 'manifestly unfair' for a court to make the construction mortgage lender an 'insurer of the subcontractors' interests.'" *Id.* at 733 (citing *D.A. Hill Co. v. CleveTrust Realty*, 573 A.2d 1005, 1010 (Pa. 1990)).

The subcontractor contended that the lender "had a duty to notify [subcontractor] that [developer] had defaulted on the loan." *Id.* at 734. We saw "no such duty," *id.*, and explained:

> If a project has not been completed, and the construction lender has not fully disbursed funds for the work completed, an unpaid subcontractor may not support its claim for payment from those funds merely by asserting that the construction lender failed in its duty to notify the subcontractor of a default, because no such duty exists. To require otherwise, would no doubt make it more difficult for developers to obtain construction loans.

*Id.* at 734-35. To prevail on its unjust enrichment claim, the subcontractor would have to "show that it was in some way induced by the construction lender." *Id.* at 735. Although the cause of action in *Kline* was unjust enrichment, as opposed to negligence, the case is

27

instructive insofar as it considers the duty of care by a lender to a party with whom it does not have a direct relationship. *See also Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship.") (interpreting North Carolina law and collecting cases).

Appellate decisions from other states that have reached this issue have broadly determined that a lender providing a construction loan owes no duty to an unpaid subcontractor absent the lender's express promise or assurance of payment. For example, in *Peterson v. First Clayton Bank & Trust Co.*, a materialman sued a construction lender for disbursing loan proceeds to the builder without first verifying that subcontractors and materialmen had been paid. 447 S.E.2d 63, 64 (Ga. App. 1994). The builder failed to pay subcontractors and suppliers, liens accrued on the property, and the bank foreclosed. *Id.* at 65. After the trial court granted summary judgment, the materialman appealed. *Id.* On appeal, the Court of Appeals of Georgia, noting that "the question of duty is for the court," found that no duty existed to ensure that suppliers were paid before disbursing funds to the builder:

> Given that the [bank's] primary role is to protect its interest in the secured property, we find no basis for imposing upon the lender the duties of the owner and general contractor to pay for labor and materials supplied to the project. Absent clear evidence that the [bank] either expressly agreed to undertake this obligation or actively participated in the monitoring of payments made during the construction, the creation of such a burden would discourage lending.

*Id.* at 68.

28

In *Resolution Trust Corp. v. BVS Development, Inc.*, the United States Court of Appeals for the Ninth Circuit considered whether a construction lender owed a duty to a subordinated seller. 42 F.3d 1206, 1214-15 (9th Cir. 1994). In affirming the grant of summary judgment, the Court held:

> The duty of a lender to supervise the use of loan funds arises only from a written agreement to do so, or perhaps from the knowledge that the seller is relying on such monitoring and the lender does not disclaim such reliance or the lender actively undertakes such a role. Because there is no duty on the bank implied in law, and because the written agreements disclaim any implied duty, the appellants' arguments must fail.

*Id.*; *see also Koppers Co. v. Garling & Langlois*, 594 F.2d 1094, 1100 (6th Cir. 1979) ("[T]here is strong authority in other jurisdictions against making construction lenders (and, we suppose, their disbursing agents) the absolute insurers of subcontractors' risks.") (collecting cases); *United Plumbing & Heating Co. v. AmSouth Bank*, 30 So.3d 343, 348 (Miss. Ct. App. 2009) ("We hold [subcontractor's] negligence claim invalid as a matter of law. We find no contract, statute, or law that would establish that [lender] had a duty to (1) pay money to a party it was not obligated to pay; (2) investigate or contradict a valid request made by its client[]; or (3) adhere to its own dispute resolution policies when [subcontractor] was neither a client nor a party to any valid contract involving [lender].").

This principle is also found in leading scholarly publications. *See* 2 LAW OF REAL ESTATE FINANCING § 14:23 (database updated November 2020) ("Ordinarily the construction lender has no duty of care to ensure that the disbursements correspond to work completed or that subcontractors and suppliers (as potential lienholders) are paid by the contractor."); Paul A. Sandars III, *Theories of Lender Liability on Construction Projects*,

29

CONSTR. LAWYER, 44 (Am. Bar Ass'n, Fall 2005) ("Generally, construction lenders that restrict their involvement to financing will not be found liable under a lender liability theory.").

Bel Air Carpet refers us, in contrast to the weight of the foregoing authorities, only to Section 1311.011 of the Revised Code of Ohio, which concerns the operation of mechanic's liens. This section provides, in pertinent part:

> (4) No lending institution shall make any payment to any original contractor until the original contractor has given the lending institution the original contractor's affidavit stating:
>
> (a) That the original contractor has paid in full for all labor and work performed and for all materials furnished by the original contractor and all subcontractors, material suppliers, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor specifically sets forth and identifies both by claimant and by amount claimed;
>
> (b) That no claims exist other than those claims set forth and identified in the affidavit required by division (B)(4) of this section.
>
> (5) When making any payment under the home construction contract or on behalf of the owner or part owner under a home purchase contract, the lending institution may accept the affidavit of the original contractor required by division (B)(4) of this section and act in reliance upon it, unless it appears to be fraudulent on its face. The lending institution is not financially liable to the owner, part owner, purchaser, lessee, or any other person for any payments, except for gross negligence or fraud committed by the lending institution in making any payment to the original contractor.
>
> After receipt of a written notice of a claim of a right to a mechanic's lien by a lending institution, failure of the lending institution to obtain a lien release from the subcontractor, material supplier, or laborer who serves notice of such claim is prima-facie evidence of gross negligence.

Ohio Rev. Code Ann. § 1311.011 (West). Bel Air Carpet asserts that this provision protects subcontractors; however, the Supreme Court of Ohio has clarified that a lending institution

30

owes a duty to the homeowner, not the subtrades. *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 525 N.E.2d 761, 770 (Ohio 1988) ("[W]hile a lending institution may owe a duty to a homeowner to obtain affidavits before disbursing funds from a construction loan, no such duty extends to subtrades."). Moreover, if we take Bel Air Carpet's argument at face value, it is requesting that we impose a broad-based common law duty of care on lenders in Maryland, predicated on a mechanic's lien statute in Ohio.[8]

We conclude that Maryland law does not recognize a general duty on the homeowner's lender to ensure that the general contractor on a home construction project pays all of its subcontractors for work completed when the lender disburses funds to the general contractor, and where there is no privity of contract or intimate nexus between the lender and the subcontractors. The public policy of Maryland and other states disfavor imposing such a general duty of care on home construction lenders. As we note above, it would be "manifestly unfair" to make lenders the "insurer of the subcontractors' interests" by imposing a general duty on lenders to ensure that general contractors properly pay unknown subcontractors for their work. *See Kline*, 102 Md. App. at 733.

---

[8] Pursuant to Maryland Code (1974, 2015 Repl. Vol., 2018 Supp.), Real Property Article, § 9-104(f)(3), "the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given." Bel Air Carpet failed to demonstrate how it could have successfully asserted a mechanic's lien when each homeowner had already paid the entire purchase price for the construction project to Korey Homes, nor did Bel Air Carpet identify any statutory, regulatory or contractual requirement on Hamilton Bank to request mechanics lien releases to ensure subcontractors and suppliers were paid.

**E. Analysis**

Applying the foregoing precepts, we hold that Bel Air Carpet has failed to allege a cognizable duty of care owed to it by Hamilton Bank because Bel Air Carpet does not allege privity or any equivalent intimate nexus in the complaint. The complaint does not allege the necessary "linking conduct" between the parties to justify Bel Air Carpet's reliance that Hamilton Bank would ensure that its borrower's funds were paid to Bel Air Carpet.[9] Bel Air Carpet concedes that "contractual privity does not exist between Bel Air Carpet and Hamilton Bank" and recognizes that it must "adequately ple[a]d 'its equivalent' to allege the requisite duty of care."

According to Bel Air Carpet's complaint, the duty allegedly owed to *Bel Air Carpet* derived from a relationship between *Hamilton Bank* and *Korey Homes*, whereby Hamilton Bank "ignored most, if not all, standard financial practices in disbursing construction loan funds to Korey Homes on behalf of its borrowers[.]" To be sure, missing from Bel Air Carpet's complaint, is the allegation of *any* relationship between Hamilton Bank and Bel Air Carpet.

As our review of our cases requiring an intimate nexus highlights, the plaintiff must allege "linking conduct" sufficient to "show the defendant knew or should have known of the plaintiff's reliance." *Balfour Beatty*, 451 Md. at 620-21. Nowhere in the complaint does Bel Air Carpet allege that Hamilton Bank made a specific promise or representation

---

[9] In reaching this holding, we do not foreclose the possibility that a contractor, subcontractor, supplier, or similar entity could allege a specific factual scenario that would demonstrate an intimate nexus with a lender.

to perform an obligation for Bel Air Carpet's benefit or that Hamilton Bank knew that Bel Air Carpet was relying on it. Bel Air Carpet seeks to cure this defect by asserting a broad-based standard in the construction industry. Unfortunately for Bel Air Carpet, neither Maryland nor most other states recognize such a broad-based duty of care that requires a lender to ensure that subcontractors and suppliers are paid. Perhaps this is an issue the General Assembly may want to address, but we decline to adopt such a broad duty of care to lenders in the construction industry as a matter of law. *100 Inv. Ltd. P'ship*, 430 Md. at 211. As the Court of Appeals, quoting an article relied on in an Indiana case, explained in *Balfour Beatty*:

> Perhaps more than any other industry, the construction industry is vitally enmeshed in our economy and dependent on settled expectations. The parties involved in a construction project rely on intricate, highly sophisticated contracts to define the relative rights and responsibilities of the many persons whose efforts are required—owner, architect, engineer, general contractor, subcontractor, materials supplier—and to allocate among them the risk of problems, delays, extra costs, unforeseen site conditions, and defects. Imposition of tort duties that cut across those contractual lines disrupts and frustrates the parties' contractual allocation of risk and permits the circumvention of a carefully negotiated contractual balance among owner, builder, and design professional.

451 Md. at 626 (quoting *Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 737 (Ind. 2010)).

If we were to adopt Bel Air Carpet's theory, we would alter the delicate contractual balance in the construction industry and the privity requirement of the economic loss doctrine. We would render Hamilton Bank the "insurer of the subcontractors' interest"— a concern we enunciated in *Kline*. 102 Md. App. at 733. Even assuming that there is a standard in the industry that a bank require mechanic's lien releases, Bel Air Carpet has

33

not alleged how or why a duty of care should be imposed upon Hamilton Bank for its benefit. *Peterson*, 447 S.E.2d at 68. Although it may be foreseeable that Hamilton Bank's failure to request mechanic's lien releases or inspect the properties could harm Bel Air Carpet, unless Hamilton Bank owes Bel Air Carpet a duty, Hamilton Bank cannot be liable to Bel Air Carpet in negligence. *Ashburn v. Anne Arundel Co.*, 306 Md. 617, 628 (1986) ("[T]here is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured.").

## II.

## Denial of Discovery

Bel Air Carpet claims that the circuit court erred in dismissing the negligence claim before the parties had engaged in discovery. Specifically, Bel Air Carpet claims it "was deprived of an opportunity to produce evidence that could better establish the elements of the relationship between it and Hamilton Bank[.]"

Bel Air Carpet's contention is without merit. Because the circuit court's ruling that Hamilton Bank did not owe a duty of care to Bel Air Carpet was a legal determination, discovery could not have saved the deficiency in Bel Air Carpet's complaint. *100 Inv. Ltd. P'ship*, 430 Md. at 211. Further, the circuit court judge limited herself to the four corners of the complaint and the accompanying exhibits in ruling on the motion to dismiss.

34

*Rounds*, 441 Md. at 636.  Correspondingly, any discovery could not have overcome Bel

Air Carpet's failure to plead the requisite duty of care in its complaint. [10]

**JUDGMENT OF THE CIRCUIT COURT
FOR HARFORD COUNTY AFFIRMED;
COSTS TO BE PAID BY APPELLEE.**

---

[10] At oral argument, counsel for Hamilton Bank asserted that two letters from Hamilton Bank's counsel, attached to Bel Air Carpet's opposition to the motion to dismiss, were not included in the record.  In the first letter, Hamilton Bank confirmed that it wired the final draw on one of the projects to Korey Homes; and, in the second, Hamilton Bank advised its borrowers that "Korey Homes may not have used some of the monies that were advanced to it under your loan to pay subcontractors who should have been paid from the proceeds of those advances."  While these documents undoubtedly *are in the record*, as we have explained, the circuit court properly declined to consider them in ruling on the motion to dismiss.

Furthermore, we clarify that this opinion does not offer any countenance to Hamilton Bank's representation at oral argument that a homeowner would be unconcerned about whether subcontractors and suppliers who contributed to the construction of their home received payment for their services.  Counsel for Hamilton Bank provided no authority for this sweeping assertion, and, on this point, there was certainly no evidence in the record.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1006s19cn.pdf